[No. S052288. Feb. 23, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
BERNARD LEE HAMILTON, Defendant and Appellant.

**COUNSEL**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and Arnold A. Erickson, Deputy State Public Defender, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, William M. Wood, Pat Zaharopoulos and Holly D. Wilkens, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MORENO, J.**—On January 5, 1981, a jury found defendant Bernard Lee Hamilton guilty of the murder of Eleanore Buchanan (Pen. Code, § 187),[1] and of robbery (§ 211), kidnapping (§ 207), and burglary (§ 459). The jury found true special circumstance allegations of robbery, kidnapping, and burglary. (§ 190.2, subd. (a)(17)(A), (B), (G).) After a penalty trial, the jury returned a verdict of death, and the court imposed judgment accordingly.

On direct appeal, this court affirmed the judgment of guilt but set aside the special circumstance findings because of instructional error under *Carlos v. Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], and reversed the sentence of death. (*People v. Hamilton* (1985) 41 Cal.3d 408 [221 Cal.Rptr. 902, 710 P.2d 981] (*Hamilton I*).) The United States Supreme Court vacated the judgment and remanded the case to this court for further consideration in light of *Rose v. Clark* (1986) 478 U.S. 570 [92 L.Ed.2d 460, 106 S.Ct. 3101]. (*California v. Hamilton* (1986) 478 U.S. 1017 [92 L.Ed.2d 734, 106 S.Ct. 3328].) This court again affirmed the judgment of guilt and, contrary to the determination in *Hamilton I*, concluded the special circumstance findings must be upheld under *People v. Anderson* (1987) 43 Cal.3d 1104, 1147 [240 Cal.Rptr. 585, 742 P.2d 1306] (overruling *Carlos v. Superior Court, supra,* 35 Cal.3d 131), and affirmed the penalty judgment of death. (*People v. Hamilton* (1988) 45 Cal.3d 351 [247 Cal.Rptr. 31, 753 P.2d 1109].) On March 22, 1994, the Court of Appeals for the Ninth Circuit reversed the penalty judgment because of instructional error under *Boyde v. California* (1990) 494 U.S. 370, 380 [108 L.Ed.2d 316, 110 S.Ct. 1190], and remanded the case to the trial court for a penalty phase retrial. (*Hamilton v. Vasquez* (9th Cir. 1994) 17 F.3d 1149.)

On December 13, 1995, after the penalty phase retrial, at which defendant represented himself, the jury returned a verdict of death. The court denied a motion for a new trial and the automatic application to modify the verdict (§ 190.4, subd. (e)) and sentenced defendant to death. This appeal is automatic. (§ 1239, subd. (b).)

For the reasons that follow, we affirm the judgment.

## I. FACTS

Defendant kidnapped and murdered Eleanore Buchanan after she left a night college math class in San Diego. He dismembered her body, disposed of her headless and handless corpse in California, and drove to Texas and Oklahoma where he was caught driving her stolen van.

---

[1] All statutory references are to the Penal Code unless otherwise specified.

Defendant represented himself at the penalty retrial; throughout the trial, however, counsel appointed to assist defendant conducted the majority of the voir dire, examination, and arguments.

### A. *The Prosecution's Case*

In the penalty phase retrial, the prosecution introduced as evidence in aggravation under section 190.3 the facts and circumstances of the underlying capital crime, evidence of 10 incidents of criminal activity involving force or violence or the threat of force or violence, and victim impact evidence. In most respects, the evidence presented differed little from that presented at the earlier trial.

#### 1. *The Underlying Crime*

##### a. *The events of May 30, 1979, to June 8, 1979*

On May 30, 1979, 24-year-old Eleanore Buchanan, known as "Fran," attended an evening math class that was scheduled to meet from 7:00 until 10:00 p.m. at San Diego Mesa College. Because she had missed several classes due to the birth of her second child, she chose not to take an optional quiz, given at approximately 9:15 or 9:30 p.m., and left the class. She was last seen walking toward the campus parking lot or a nearby street. She had driven the new blue van she and her husband Terry Buchanan had purchased weeks earlier; Terry used the van during the day to make deliveries for a dental lab.

About 1:30 p.m. the following day, May 31, 1979, Harry Piper, a target shooter, discovered a body, later identified as that of Eleanore Buchanan, in a cul-de-sac in Pine Valley,[2] south of Interstate Highway 8. The head and hands were missing and there were ligature marks on the ankles and wrists.

Forensic pathologist Dr. Joseph Luibel, who conducted the autopsy, testified the cuts around the head and right hand were smooth and consistent with marks made by a saw, while the cut on the left wrist was consistent with having been made by a knife. All of the amputation marks were consistent with having been made by someone without much knowledge of anatomy and with rudimentary knowledge of the use of a knife and saw. The body was exsanguinated, but he was unable to determine with certainty the cause of death, and noted several postmortem wounds to the chest and abdomen. He noted that when the body was discovered, it was lying on its back and both forearms were raised several inches off the ground, a common result of

---

[2] Pine Valley is approximately 45 miles from San Diego Mesa College.

rigor mortis. Based on an examination of the stomach contents he concluded the victim died between 10:00 and 10:30 p.m. on May 30, 1979. Based on the stage of rigor mortis and the condition of the forearms at the time of discovery, he concluded the body was left in Pine Valley approximately six hours after death, or between 4:00 and 4:30 a.m. on May 31, 1979.

Defendant lived with his parents on Comstock Street in Linda Vista, California, approximately one mile from San Diego Mesa College. Donna Hatch lived in Terrell, Texas. She and defendant had corresponded since 1973, and first met in person in 1976. Telephone records from the Hamilton residence in Linda Vista revealed that at 1:52 a.m. on May 31, 1979, just hours after Eleanore Buchanan's classmates last saw her alive, defendant telephoned Hatch. Hatch testified defendant told her he planned to head for Texas that morning after he got some gas. During the evening of June 1, 1979, defendant showed up at Hatch's house in Terrell, Texas, driving a van. Hatch noted that the van had a broken window, a broken armrest, and a bent inside curtain rod. The next day, Hatch and her sister, niece, and daughter drove with defendant to Oklahoma and Ft. Worth, Texas, and back to Terrell, Texas, stopping to sleep at a rest stop where defendant used Buchanan's credit cards to buy gas. On June 4, 1979, defendant and Hatch stopped at a phone booth near a hotel where defendant made two telephone calls. After the second call, defendant's demeanor changed and he became nervous.[3] Hatch overheard defendant say he had traveled to Texas by airplane, which she knew to be untrue, and that "he thought he had killed somebody," or thought he had killed "a man." Defendant asked Hatch to go to a car lot and steal Texas license plates to exchange with the California plates on the van, but she refused. Defendant and Hatch talked about his former wife; defendant had led her to believe that his former wife was dead, but on this day he told her she was alive. When Hatch became upset about the lie, defendant asked her if she wanted him to kill his former wife. Hatch decided to end her relationship with defendant.

On June 8, 1979, from Greenwood, Louisiana, defendant phoned Hatch at her house. Her grandmother answered the phone, and when Hatch got on the line, she heard defendant say, "I'll kill you, too."

On June 8, 1979, the use of Terry Buchanan's credit card at a Stuckey's restaurant in Marietta, Oklahoma, triggered an alert to the Love County Sheriff's Office to be on the lookout for the Buchanans' blue Dodge van bearing Oklahoma license plates. Officers thereafter found defendant driving the van. Upon his arrest, defendant told the officers he got the van from a

---

[3] Defense witness Clifford Harris was a friend of defendant's in San Diego. Harris received a phone call from defendant in Texas, and Harris told defendant of a local news report about the police finding a woman's body.

friend of his sister in Oklahoma City. Love County Sheriff's deputies searched a site south of Marietta and, in a pile of dumped trash, found fast-food wrappers, unset false teeth, dental equipment, literature and pamphlets dealing with dental supplies, a Texas Department of Public Safety traffic warning slip bearing defendant's name and dated June 7, 1979, a collection of school notes and a quiz from a math class, a license plate bracket that said "National City, Stanley Dodge" (the dealership where the Buchanans purchased the van), and credit cards, courtesy cards and receipts bearing Eleanore Buchanan's and Terry Buchanan's names and bearing signatures that were not in Terry Buchanan's handwriting.

### b. *Forensic evidence*

A sheriff's deputy found a saw, two shanks of rope, a butcher knife, a screwdriver, credit cards, a spiral notebook entitled "Math 118," and a handwritten note addressed "Look, Donna" inside the van.

Blue fibers from the carpet in the van matched fibers found on top of Eleanore Buchanan's abdomen, on her socks and feet, and on the exposed bone of her right wrist. The rear of the van had a couch seat spanning the two rear fender wheel wells; the seat folded up to reveal the spare tire and additional storage space. San Diego County Sheriff's officers found a "fairly extensive" bloodstain on the inside, top, and side carpeting covering the right fender wheel well and running down over the edge of the fender wheel well onto the flat surface of the carpet bed and van floor underneath the couch seat; blood drops on the rim and wheel of the spare tire; blood on the couch rail; two small bloodstains in the middle of the van forward of the couch seat and behind the driver's seat; and blood on the inner right toe of a pair of shoes identified as belonging to defendant. A total of approximately one unit of blood was found in the van. Using blood-type group characteristics, Criminalist Brandon Armstrong opined that Eleanore Buchanan's blood was consistent with the blood found inside the van: The samples of Buchanan's blood taken at the autopsy, the blood taken from the couch rail of the van, and the blood taken from the carpet in the van were all of blood group "O," and each of the three samples contained identical enzymes and serum proteins. The blood found on defendant's shoe inside the van could only be tested for blood type, and was found to be type "O." Defendant's blood was type "A."

Armstrong testified that the one unit of blood found in the van, which was approximately 1/12 the amount of blood in a human body, was inconsistent with the amount of blood he would have expected to find had the body been dismembered inside the van. He believed the body had been transported inside the van on top of the spare tire in the wheel well.

Tire marks, compressed grass, drag marks, and blood on the berm of the cul-de-sac in Pine Valley where Eleanore Buchanan's body was found indicated something heavy had been dropped and dragged away from the middle of the tire tracks. Several sets of tire tracks were found at the scene; none matched the tires on the Buchanans' van and none was definitively connected to the Buchanan murder.

### c. *The Crawford interviews*

Detective Crawford of the San Diego County Sheriff's Department interviewed defendant on June 9 and 10, 1979, in the Love County Sheriff's Office in Oklahoma. Crawford made audiotapes of each interview, and the prosecution played both tapes during trial and gave each juror a written transcript of each tape. In the first interview, defendant said he ran into Calvin Spencer, also known as "Spider," a friend whom he had not seen since 1973, and Spider's "old lady," Fran, at College Billiards in San Diego on Wednesday, May 30, 1979. Fran had left her husband, and she and Spider were driving across the country. Defendant, who told Spider and Fran he would like to do some traveling, agreed to travel with them. Defendant told them he had no money, and Spider and Fran said they would take care of expenses. Defendant told Crawford he thought he might be able to make some money with a "check writer" machine he brought with him from home.

Defendant told Crawford he, Spider and Fran drove to his parents' house in Linda Vista to pick up his clothes and shoes before leaving San Diego. They drove east on Interstate Highway 8, using Fran's and her husband Terry's credit cards to buy gas along the way. Throughout the trip, all three of them signed the credit card receipts.

Defendant told Crawford he dropped off Spider and Fran in Shreveport, Louisiana, after Fran gave him permission to drive the van on his own to his cousin's house in Oklahoma City. Fran and Spider were to call him there the following day. Fran also left the credit cards with defendant for him to use "for gas and stuff along the way." Defendant explained that Spider had exchanged the California license plates on the van for Oklahoma license plates in order to minimize any difficulty defendant might encounter in using the Buchanans' credit cards at gas stations when Fran would not be there to vouch for his use of the cards. Defendant first learned there was something wrong when he tried to use one of the credit cards at the Stuckey's restaurant in Marietta, Oklahoma, and the cashier called the police.

Defendant said he bought the butcher knife sheriff's deputies found in the van at a variety store in Shreveport, Louisiana, explaining that he thought he might need some protection on the road and, since he was "an ex-con," he

could not purchase a gun. He denied purchasing the saw and rope found in the van, and denied picking up any hitchhikers along the way.

Defendant acknowledged that Terry Buchanan's name was on the credit card he used. He told Crawford that Spider sometimes referred to Fran as Eleanore, that a photograph of Eleanore Buchanan holding her newborn baby, shown to him by Crawford, looked like Fran, and that Fran was wearing light-colored jeans and carrying a beige cloth purse when they were traveling. He said he last saw her in Shreveport, Louisiana, on Thursday, June 7, and she was alive, well, and hiding from her husband.

In the second interview, conducted the next day on June 10, 1979, defendant told Crawford that earlier in the evening of Wednesday, May 30, 1979, before going to College Billiards where he met Spider and Fran, he visited a friend, Theresa, at her house in San Diego. Theresa then drove him to the house he shared with his parents, where he stayed until at least 9:00 p.m. Five or 10 minutes later, without speaking to his parents, he left and "went down the road hitchhiking." He then walked to College Billiards, arriving shortly before 10:00 p.m. There he ran into Spider, whom he had not seen in "quite a few years." They discussed defendant's desire to get some paper with which to print up and write bad checks on the check writer, and defendant suggested that Fran would cash the checks he wrote. He also stated that he brought the butcher knife from his parents' home, and he did not remember telling Crawford the day before that he had bought the butcher knife in Shreveport, Louisiana. He also said he might have bought it in Benson, Arizona. He acknowledged police in Texas had stopped him for speeding and issued him a warning ticket while Spider and Fran were with him.

Defendant told Crawford he never went near San Diego Mesa College on the night of May 30, 1979; he had not seen any blood in the van but any blood found there was his; and no crime had been committed but the police "just got stuck with a corpse and a runaway wife."

### d. *Defendant's testimony in the first trial*

The prosecution read into the record defendant's testimony from the first trial; there, defendant admitted stealing the Buchanans' van and forging Terry Buchanan's name on credit card receipts, but denied knowing, seeing, or ever coming into contact with Eleanore Buchanan, alive or dead.

Specifically, in the first trial defendant testified that around noon on May 30, 1979, he walked from his home to his doctor's office to receive treatment for a cut on his right hand. He then walked toward his home but before he

got there his friend Theresa Roch picked him up in her car. They drove to several locations before stopping at Jean Zimmerman's house, where they stayed until 7:00 or 7:30 p.m. when he left to return home. He got into the car of another friend, Johnny Renault, who drove first to the Linda Vista shopping center, where defendant got out and talked to friends for five minutes before walking home. He got home around 8:00 p.m.

Around 9:00 or 9:10 p.m., his friend Clifford Harris stopped by. Defendant and Clifford left around 9:10 p.m. and walked several blocks to his sister-in-law Carolyn's house. He stayed there for 25 or 30 minutes. When he left, he walked alone to a Minute Mart store, where he bought a beer. He ran into a security guard he knew, Butch Smith, talked for a moment, and then walked home. He saw no one when he got home, and went to his room where he listened to the radio and wrote poetry for a "couple of hours." He again left the house sometime after 12:00 a.m. to go to a 7-Eleven store where he bought cigarettes and saw his friend Butch McIntyre. He saw a police car and, because he knew there were traffic warrants for his arrest, he took another route home.

Defendant claimed he first saw the Buchanans' van around 1:00 a.m. on May 31, 1979, parked on Tait Street in Linda Vista when he was walking from the 7-Eleven store on Linda Vista Road. He peered inside and saw a purse on the passenger seat. He found the van unlocked, opened the door and reached for the purse. He saw the keys in the ignition and because he "didn't feel like walking," drove it home.

Defendant called Donna Hatch, his fiancée, who lived in Texas and was a prospective witness in a criminal case defendant had pending in San Diego involving a 1976 crime. He earlier had made plans to go to Texas to visit Hatch, and after he stole the van he decided to use it to get there. He went through the purse he found in the van, kept the credit cards, and packed some clothes and shoes. By the time he left his parents' house in the van, it was "nearly light." He drove east on Interstate 8,[4] stopping for gas in El Cajon. He tossed the purse out of the window in El Centro, after he turned onto Interstate 10, and drove to Terrell, Texas.

Defendant admitted that when Detective Crawford first interviewed him after his arrest, he made up the story about driving across the country with

---

[4] Interstate Highway 8 passes by Pine Valley, California, where Eleanore Buchanan's body was found.

Spider[5] and Fran because he stole the van and "didn't want to get stuck with auto theft." He testified that he intended to burglarize several stores in Terrell, Texas, and to that end bought a saw, a wrench set, and a screwdriver. He admitted that he bought the butcher knife and rope on June 7, 1979, in Lewisville, Texas, because he planned to abandon the van in a wooded area near Shreveport, Louisiana, and use the knife and rope to cut and tie bushes to camouflage the van from view so he could leave inside items taken during the burglaries; he would then fly home. He admitted he told Donna Hatch he "may have killed a man," but he did so in order to distract her from the lies he told her about his former wife. Defendant testified that he exchanged the California license plates for Oklahoma license plates while he was in Oklahoma City because "I always do that the week after I'm driving a stolen vehicle." He identified the shoes found in the van as his, and denied ever seeing blood on the shoes or anywhere inside the van.

Defendant acknowledged that in June 1979, before the preliminary hearing, he wrote a letter from the San Diego jail to Terry Buchanan in which he said, "Fran is not dead! . . . She is alive and either in Shreveport, Louisiana or Oklahoma City with a guy named Calvin Spencer . . . you are probably full of grief when you should be highly pissed off . . . Fran might be somewhere all wacked off from P.C.P. and about to get into some really serious trouble with Calvin." He also acknowledged that these statements were lies, and explained he wrote the letter because he did not trust his appointed counsel or the district attorney's office, and "it was my hope that if I present such a letter and was convincing enough that I might possibly . . . get Mr. Buchanan to get the FBI to investigate to determine whose . . . body was found out there. Because I didn't think my luck was bad enough to have stolen a homicide vehicle."

He admitted he wrote several letters to Theresa Roch in June 1979, asking her to pretend she was Eleanore Buchanan and to call Terry Buchanan and the television news stations and tell them she was still alive. He also wrote a letter to a friend, B.J. Brown, asking him to tell the police that "I came to your house on June 1, 1979, with a Black dude and his lady . . . his name was Spider and his lady was Fran. It's very important that you remember this because I need witnesses who can say they saw me with these two people in that blue van."

---

[5] A "wanted poster" for a David L. Walls, alias "Spider," was on the bulletin board in view of jail inmates in the hallway of the Love County, Oklahoma, Sheriff's Office at the time of defendant's arrest. Defendant later acknowledged that the Spider to whom he referred did not exist.

### 2. Other Criminal Acts Involving Force or Violence or Threats of Force or Violence

#### a. Assault of Beverly Manning

Beverly Manning met defendant in Shreveport, Louisiana, when she was a teenager. On two occasions, when Manning refused to go somewhere with defendant, defendant threatened her with a weapon; in Louisiana he pulled a gun on her, and in California he held a knife to her throat.

#### b. Assault and robbery of Ruth Story

On November 7, 1976, defendant and Beverly Manning assaulted 55-year-old Ruth Story of Linda Vista while she was walking home from the grocery store. Defendant hit Story in the face with his fist, knocked her to the ground, tore away the purse Story had attached to her cane and wrist, pulled Story on her stomach to the curb, and ran away. Story suffered a broken cheekbone, required plastic surgery to correct injuries to her jaw, and stayed in the hospital for a week.

#### c. Assault of Kenneth Dotson and Frank Auer

In the fall of 1976, defendant, in the company of Beverly Manning and Jerre Brown, stole a television set from a hotel at a truckstop in Louisiana and sold it to Jerre Brown's mother for $90.

Defendant stood trial for the burglary in March 1977, in Shreveport, Louisiana. Kenneth Dotson, Jerre Brown's brother, testified for the prosecution. During the pendency of the trial, while in a secured area of the jail, defendant jumped on and hit Kenneth Dotson, who fell against his attorney, Frank Auer, knocking both to the ground. Defendant continued to hit Dotson four or five more times until stopped by sheriff's deputies.

#### d. Assaults on Jerre Brown

In December 1976, defendant, Jerre Brown, and Beverly Manning were in jail in Shreveport, Louisiana, under arrest for the burglary of the truckstop hotel. Defendant asked Brown and Manning, who were both juveniles at the time of the burglary, to take full responsibility for the burglary in order to exonerate him. Brown instead told the truth about the burglary and gave testimony unfavorable to defendant. While in a holding cell with 40 other inmates awaiting transportation to the courthouse from the jail, defendant attempted to stab Brown in the head with a pen, requiring the guards to spray

Mace on both of them. Later, at the courthouse, defendant hit Brown in the face with his fist, knocking him against the wall.

### e. *Assault on Rosie Blackmon*

In early 1979, defendant was dating Rosie Blackmon, who drove a taxi and was going to truck driving school. They spent a night in a motel and, when Blackmon tried to leave the following morning to go to school, defendant told her she could not leave and punched her in the head five or six times. Later, when she tried to end the relationship, he stalked her and eventually assaulted her on the street, knocked her to the pavement and kicked her in the head.

### f. *Threats of violence to Frank Sexton, Thomas McArdle, Patrick O'Connor, and Brandon Armstrong*

On July 6, 1979, defendant wrote a letter to Theresa Roch from the San Diego County Jail in which he threatened to "take out" his trial counsel, the two prosecutors, the prosecution's criminalist, and their families if he were to be convicted.[6]

### g. *Assault on Thomas Ryan*

On September 17, 1980, defendant assaulted Thomas Ryan, the attorney who represented him in the first trial, in the San Diego County Jail. Defendant had asked Ryan to visit him in the jail that evening. When Ryan arrived at the visiting room at 6:30 or 7:00 p.m., he sat down on a small stool and waited for defendant. Defendant entered the room, approached Ryan and began to hand him a set of papers. Before he could take the papers, defendant struck him in the jaw with what Ryan described as a "very hard blow," a "sucker punch," which knocked Ryan to the floor. Defendant said nothing. Before Ryan could get up, defendant turned and left the room. Ryan testified that during the 20 years in which he practiced criminal defense and represented 500 or more clients, 25 or 30 of whom were accused of murder, none had ever punched him in the face.

---

[6] Defendant wrote, "By the way, today I got news from Quack. He says he knows I am innocent but also knows how I will get railroaded. So if I loose [*sic*] this case, they will take out O'Connor, Sexton, McCarno [*sic*] and Armstrong, or at least one member of their family [*sic*]. I don't like the idea of violence, since I have never been a violent person and the proposal seeks my agreement. I haven't sent an answer as of yet because I have to consider a lot of things before I do. I don't like the idea . . . but I also don't like sitting on someone else's murder charge! So that gives me a lot to think about."

### h. Assault on Patricia Robinson

On a Sunday morning in September 1980, defendant assaulted Patricia Robinson, a paralegal hired to assist Ryan in the pending capital trial. Robinson had visited defendant numerous times to help prepare for trial and met with him in the attorney visiting room. At the end of the visit that morning, as Robinson got up to leave, defendant grabbed her and said, "No, no. Stay longer." She again tried to leave and defendant blocked her exit. He grew agitated and said, "Well, I could rape you." She kicked the arch of his foot and punched him, but he did not respond. She started yelling for help from the guards and tried to pull aside the privacy curtain that was covering the window in the door. Defendant slammed her against the window and put his hands around her neck and mouth, and Robinson started to lose consciousness. Defendant had control of her arms and legs, but she managed to bite his finger. Defendant released her and said, "You bit me, I'm bleeding." Robinson managed to leave the room, and thereafter had bruises on her arm, legs and throat. She testified she thought she would die that day.

### i. Assault on William Hanson and Johnnie Christiansen

On October 8, 1980, defendant assaulted San Diego County Sheriff's Deputies William Hanson and Johnnie Christiansen in his cell at the San Diego County Jail. Defendant refused to get out of bed to come to court. When one of the deputies pulled off defendant's blanket, defendant leaped up, backed into the corner and assumed a fighting stance with his arms and fists raised. He told the deputies, "If you want . . . me to go to court you're going to have to take me to court." The deputies grabbed defendant, forced him out of the cell and up against a wall, and placed waist and leg chains on him. Defendant resisted and struggled before the officers gained control. As the deputies led defendant down the hall, he continued to resist and spat on Hanson's face.

### 3. Victim Impact Evidence

The prosecution presented several witnesses who testified to the impact of Eleanore Buchanan's murder on her family, particularly on her husband Terry Buchanan, who died of coronary heart disease in 1994 before the penalty retrial. These witnesses included Eleanore's mother and grandmother, Terry's mother, Eleanore and Terry's sons Jason and Joseph, neighbors and friends, and the former prosecutor. This evidence is discussed in detail below. (See III.G., *post.*)

B. *Defendant's Case in Mitigation*

Defendant presented evidence aimed at showing a lingering doubt of his guilt in the murder of Eleanore Buchanan, the artwork he produced during his incarceration, his positive adjustment to prison life, and his family history.

### 1. *Lingering Doubt*

Defendant argued that, notwithstanding the guilty verdict in the first trial, there existed evidence in support of a lingering doubt as to his guilt of the capital crimes, warranting a penalty of less than death.

Defendant testified in his own defense, offering essentially the same testimony he gave at the first trial: He denied killing Eleanore Buchanan. He denied ever seeing her, alive or dead, but admitted he stole her van and used her credit cards to travel to Texas in order to pick up Donna Hatch and make money committing burglaries. He admitted he made up the "Spider and Fran" story when first questioned by Detective Crawford in an attempt to avoid being charged with forgery and taking a stolen vehicle across state lines.

Defendant offered the testimony of investigators and forensic scientists to challenge the prosecution's physical evidence. He argued the prosecution had not established that the Buchanans' van made the tire marks at the cul-de-sac in Pine Valley where the body was found, and he challenged the prosecution's conclusion that the body was transported to Pine Valley inside the Buchanans' van.

Several witnesses testified they were with defendant at various times during the night of Eleanore Buchanan's murder.

### 2. *Artwork*

Numerous witnesses testified regarding artwork defendant made while on death row in San Quentin State Prison. Some saw the artwork in the prison gift shop; others saw it displayed at private parties or conferences held in support of the abolition of the death penalty. Many were impressed with the artwork's beauty. Others were impressed with the gentility, grace, humanity, "plea for racial harmony" and "message of brotherly love" they saw revealed in the work.

### 3. *Adjustment to Prison Life*

James Park, former associate warden of San Quentin State Prison, reviewed defendant's prison records and gave his opinion that if the jury

returned a verdict of life without the possibility of parole, prison officials would house defendant in a maximum security prison and defendant would not pose an escape risk or a risk to the safety of other inmates or correctional officers.

An artist who worked as a teacher and art facilitator at San Quentin State Prison testified defendant was a dedicated and serious art student who was ambitious, talented and had a particular style. Defendant had painted portraits on commission.

Another art teacher who worked at San Quentin State Prison testified that art programs in prisons had positive effects on inmates, and a sentence of life without the possibility of parole served at a maximum security prison would allow defendant to continue to paint and to help other inmates learn to paint.

### 4. Family History

Christopher and Ernest Hamilton, defendant's brothers, testified they had a normal relationship with defendant while they were growing up. The family was close and their parents created a safe and diverse environment. Hazel Hamilton, defendant's mother, testified she and defendant's father, Ernest Hamilton, Sr., were devoted to their church and family and raised their children in a loving household. She and defendant communicated regularly since his incarceration, and he sent her drafts of his artwork for her to critique. Bernard Hamilton II, defendant's son, testified he did not know his father well when he was young, but since defendant's incarceration, they corresponded regularly and had gotten to know each other. Finally, Reverend Forest Hancock testified that when defendant was 15 years old he started coming to the Freewill Missionary Baptist Church in San Diego. Hancock recognized that defendant was "a good kid" with leadership abilities and other children looked to him for help. Hancock noticed a change in defendant's demeanor after defendant divorced his first wife.

## II. JURY SELECTION

### A. Restriction on Voir Dire

Defendant first claims the trial court improperly restricted him from questioning three prospective jurors about specific biases they may have had related to the facts of the case, and thereby violated his federal and state constitutional rights to due process and a fair trial. We conclude the trial court did not err.

■ "Prospective jurors may be excused for cause when their views on capital punishment would prevent or substantially impair the performance of

their duties as jurors. (*Wainwright v. Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844].) 'The real question is " ' "whether the juror's views about capital punishment would prevent or impair the juror's ability to return a verdict of death *in the case before the juror*." ' " ' [Citation.]" (*People v. Cash* (2002) 28 Cal.4th 703, 719–720 [122 Cal.Rptr.2d 545, 50 P.3d 332].) We have explained, however, that "death-qualification voir dire must avoid two extremes. On the one hand, it must not be so abstract that it fails to identify those jurors whose death penalty views would prevent or substantially impair the performance of their duties as jurors in the case being tried. On the other hand, it must not be so specific that it requires the prospective jurors to prejudge the penalty issue based on a summary of the mitigating and aggravating evidence likely to be presented. [Citation.] In deciding where to strike the balance in a particular case, trial courts have considerable discretion. [Citations.] They may not, however, . . . strike the balance by precluding mention of any general fact or circumstance not expressly pleaded in the information." (*Id.* at pp. 721–722.)

The questionnaire informed the jurors that "[i]n this case a young woman who attended Mesa College was murdered on May 30, 1979. Her decapitated body was found the next day in Pine Valley, about 45 miles east of San Diego. The defendant, Bernard Hamilton, was arrested about a week later in Oklahoma while driving the victim's van." The court orally informed the jurors that the jury in the first trial convicted defendant of murder in the first degree, robbery, burglary and kidnapping, and found true the special circumstances of robbery, burglary and kidnapping.

### 1. *Prospective Juror M.F.*

During voir dire, defendant's counsel asked of Prospective Juror M.F., a mother of eight who homeschooled her children and was still nursing the youngest, "You know that in this case in the course of a robbery, burglary and kidnapping a young mother was killed, and another jury has found Mr. Hamilton did that killing. Is that the type of crime that leads you to believe the death penalty is the right answer?" M.F. answered, "It is the type of crime that would make me lean in the direction of the death penalty . . . the fact that I'm a mother and I have protective instincts a mother bears." Counsel then asked if nursing a child was an "important part of the mother [and] child relationship, correct?" M.F. answered, "Yes, very important."

The court sustained the prosecution's objection to defense counsel's next question: "And in your opinion is [there] something particularly heinous about depriving [a] child of that relationship?" Defendant's challenge for cause was denied and defendant used a peremptory challenge to excuse M.F. Defendant argues the court improperly restricted his ability to determine M.F.'s biases.

We find no abuse of discretion. Contrary to defendant's argument, the ruling did not preclude defendant from probing into M.F.'s views regarding whether a defendant who deprived a child of a relationship with his or her mother might deserve the death penalty. Rather, it restricted him from asking M.F. to describe how bad she thought such a crime might be. We agree with the trial court that such a question essentially asked M.F. to prejudge the case and weigh a factor in aggravation before trial.

## 2. Prospective Juror P.A.

Defendant asked Prospective Juror P.A. if she supported the death penalty; she answered she did. He asked if she would automatically impose the death penalty because defendant had been found guilty; she answered she would. He then asked if she would suspend her decision until she heard evidence about defendant's background and character, and if she thought defendant's background and character would be relevant to her determination of penalty; she answered she did not think defendant's background was "particularly relevant."

The prosecutor then asked if P.A. could follow the court's instructions that she must consider all of the factors in mitigation and in aggravation before she reached her verdict; she answered she could. The court asked if she would fairly, objectively and impartially evaluate evidence offered in mitigation and in aggravation, and if she would consider that evidence before making her choice of penalty and "not focus just on the crime itself?" She answered, "Okay." The court also asked her if there were "certain categories of crimes" that deserved the death penalty, or if she would reach a verdict "based on the evidence of this particular case?" She answered, "I think the degree of violence. . . . I just feel in my heart that if somebody is—does something so bad that they should deserve to die also."

Defendant then asked, "Are there those cases which the facts are such that you can't consider character and background, that there are cases so bad people deserve to die . . . whether or not you're told as a matter of law you have to consider [defendant's background and character]?" P.A. gave a lengthy answer to the last question,[7] after which the court said, "All right. I think we've sufficiently probed that matter."

---

[7] P.A. answered, "I don't know. I honestly have to say I don't know what kind of information that I would receive that would make me make a decision one way or the other on that. You know, I can't say that the character information that's given to me, that I need to weigh that, something that I have to do personally and make a decision on that, compared to the evidence, the crime or the degree of the crime. I was not aware of the character part of it that the judge just explained. I would have to rethink that. It can't be just black and white. Maybe the court is going to tell us we have to look at the person and what they have done that's been maybe the good, the bad, we have to kind of weigh it, and it's our choice to weigh how important it is. So I can't say by your question that—and I'm sorry I'm not real

Defendant asked no further questions, and the court thereafter denied defendant's challenge for cause. P.A. served on the jury.

Defendant now argues that in stating, "we've sufficiently probed that matter," the court refused to allow him to determine if any particular type of crime would impair P.A.'s ability to render a fair judgment in this case. Defendant did not ask P.A. any other questions, nor did he ask the court to clarify the scope of its ruling; hence, he cannot complain on appeal that the court denied him the opportunity to ask P.A. if any particular type of crime would impair her ability to render a fair judgment in this case.

In any event, we conclude defendant was not limited in his ability to assess P.A.'s views on the death penalty. The queries of the court, the prosecutor and defense counsel together sufficiently covered the issue of whether or not there were any types of crimes for which P.A. would invariably vote for the death penalty. These questions did, in fact, cover the area defendant now claims the court precluded him from exploring.

### 3. *Prospective Juror D.O.*

Finally, defendant argues the court erred by restricting defendant's questions of Prospective Juror D.O.

Defense counsel told Prospective Juror D.O. that in this case "there are two choices." "[I]n arriving at one of those two choices you have to consider a multitude of things; that you can't just consider the crime itself, that you have to consider other factors that might be offered to you in mitigation that have nothing to do with the crime itself specifically," "like whether Mr. Hamilton has made a contribution to society, could continue to do so, that sort of thing. The law says that you must consider it. It doesn't tell you how much weight you have to give it but you must consider it." "If your mind is such that you really can't consider it, that you'll listen to it but you can't consider it, . . . you can't sit as a juror."

Prospective Juror D.O. replied that he "can consider, I will adhere to the law of California."

Defense counsel then asked, "So there's no crime in your opinion, or is there, is there a threshold level that's so heinous, you don't care what good works a man has done that's . . . ." D.O. answered, "Yeah. The Oklahoma City bombing. They prove those guys guilty, I mean, I'm sorry. They kill a bunch of kids and a bunch of people that have, you know, no business being

clear—that the death penalty I would waive, definitely would waive depending on their character. I can't give you an exact answer."

dead. And do it in that kind of senseless, violent way, I would have very little trouble, you know, sitting in a penalty phase of that one because it would be over. Sorry about that if it sounds strong."

Defense counsel then asked, "So if in this instance you were moved to that level of personal abhorrence over the crime—not saying the facts were the same, but if you were moved to that level of personal abhorrence over the crime, you're telling us from your heart that you cannot consider anything about Mr. Hamilton's personal life, whatever good works he did?" The prosecutor objected to the question on the grounds that it asked D.O. to prejudge the case; the court sustained the objection. (See *People v. Cash, supra*, 28 Cal.4th 703, 719–720.) Defense counsel asked again, "Well, what I'm really trying to find out, in reality, deep in your heart, knowing how you feel about the Oklahoma City case, can you in good conscience tell Mr. Hamilton that you can in reality consider personal factors in his life, or is it your state of mind such that given a certain set of facts, if you're moved to a certain point you're not going to think about them?"

The prosecutor objected again on the same grounds; the court sustained the objection. Defense counsel then asked, "Can you in this case forget about facts specific—can you, when you sit there, really consider factors about the defendant himself independently of the crime?" D.O. answered that he could. The court thereafter denied defendant's motion to excuse D.O. for cause (see II.C.6., *post*) and defendant used a peremptory challenge to excuse him.

Defendant now argues the court improperly restricted voir dire in that he was prohibited from gauging what would be the threshold level of abhorrence to a crime that would preclude D.O. from being able to consider factors in mitigation.

We agree with defendant that the court was mistaken when it sustained the objections to his questions, but disagree that the mistake violated due process or the mandates of *People v. Cash, supra*, 28 Cal.4th 703, 719–720. Contrary to the court's ruling, defendant's questions did not ask D.O. to prejudge the facts of this case—with the exception of the court's initial description that this case involved "a first degree murder under special circumstances [and] the related crimes of robbery, kidnapping and burglary," none of the voir dire of D.O., and neither of the two restricted questions, contained any direct or indirect references to the facts of this case. But, contrary to defendant's assertion, the restricted questions did not attempt to get D.O. to place this case somewhere on a relative scale of abhorrence upon which the Oklahoma City bombing was at the top, a question which would improperly have asked D.O. to prejudge the case. Rather, the restricted questions asked D.O. if, in this case, he were to be moved to the same level of abhorrence he felt

with regard to the Oklahoma City bombing case, would he or would he not be able to consider any factors offered in mitigation. In essence, the restricted questions merely mirrored back to D.O. his own stated sentiments that the Oklahoma City bombing case would be the kind of crime for which he knew he could not consider any factors in mitigation. This line of inquiry did not ask D.O. to prejudge the case, but also was not highly relevant to D.O.'s qualifications to be a juror—the questions asked whether D.O. could or could not follow the court's instructions that he must consider the factors in mitigation, under circumstances that admittedly were not present in this case. (*Wainwright v. Witt, supra,* 469 U.S. at p. 424 [prospective jurors may be excused for cause when their views on capital punishment would prevent or substantially impair the performance of their duties as jurors].)

Thus, the court was incorrect in concluding that the questions improperly asked D.O. to prejudge the case, but the court did not abuse its discretion in restricting the questioning. The restricted questions were not highly relevant, and defendant was not limited thereby in his ability to assess D.O.'s views on the death penalty or thoughts on his ability to be a fair juror.

### B. *Excusal for Cause of Prospective Juror W.B.*

Defendant next contends the trial court erroneously excused for cause Prospective Juror W.B. after voir dire concerning his views on the death penalty. We see no error.

■ " 'The state and federal constitutional guarantees of a trial by an impartial jury include the right in a capital case to a jury whose members will not automatically impose the death penalty for all murders, but will instead consider and weigh the mitigating evidence in determining the appropriate sentence.' (*People v. Weaver* (2001) 26 Cal.4th 876, 910 [111 Cal.Rptr.2d 2, 29 P.3d 103]; accord, *People v. Crittenden* [(1994) 9 Cal.4th 83,] 120–121 [36 Cal.Rptr.2d 474, 885 P.2d 887].) However, a 'juror may be challenged for cause based upon his or her views concerning capital punishment only if those views would "prevent or substantially impair" the performance of the juror's duties as defined by the court's instructions and the juror's oath.' [Citation.]" (*People v. Bonilla* (2007) 41 Cal.4th 313, 338–339 [60 Cal.Rptr.3d 209, 160 P.3d 84].)

" ' "Assessing the qualifications of jurors challenged for cause is a matter falling within the broad discretion of the trial court. [Citation.] The trial court must determine whether the prospective juror will be 'unable to faithfully and impartially apply the law in the case.' [Citation.] A juror will often give conflicting or confusing answers regarding his or her impartiality or capacity to serve, and the trial court must weigh the juror's responses in deciding

whether to remove the juror for cause. The trial court's resolution of these factual matters is binding on the appellate court if supported by substantial evidence. [Citation.] '[W]here equivocal or conflicting responses are elicited regarding a prospective juror's ability to impose the death penalty, the trial court's determination as to his true state of mind is binding on an appellate court. [Citations.]' [Citation.]" ' (*People v. Boyette* [(2002) 29 Cal.4th 381,] 416 [127 Cal.Rptr.2d 544, 58 P.3d 391]; accord, *People v. Moon* (2005) 37 Cal.4th 1, 14 [32 Cal.Rptr.3d 894, 117 P.3d 591].)" (*People v. Bonilla, supra,* 41 Cal.4th at p. 339.) "In other words, the reviewing court generally must defer to the judge who sees and hears the prospective juror, and who has the 'definite impression' that he is biased, despite a failure to express clear views." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1007 [47 Cal.Rptr.3d 467, 140 P.3d 775].) The United States Supreme Court recently explained: "Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors." (*Uttecht v. Brown* (2007) 551 U.S. 1, 9 [167 L.Ed.2d 1014, 127 S.Ct. 2218, 2224].)

Prospective Juror W.B. made statements during voir dire that suggested he could be fair to both sides and had not foreclosed the possibility of returning a verdict of either death or life without the possibility of parole. In his answers to the juror questionnaire, however, he indicated he was opposed to the death penalty,[8] and when pressed further by both parties and the court, he gave conflicting and ambiguous answers. The trial court asked if he could ever actually return a verdict of death. W.B. replied, "No, sir." He explained that he believed "there were better ways of doing it, even though we haven't come up with one. Not to say that I couldn't be opposed to it." He then stated, "It really doesn't serve a purpose. I mean an eye for an eye, . . . what does an eye for an eye mean?" The court asked, "Realistically, then, do you think you would always choose the other choice, the other option of life without possibility of parole?" W.B. answered, "Yes." The court asked, "The [P]eople here don't really have any realistic chance of persuading [you to] return a death verdict, do they?" W.B. replied, "There's always that possibility. You know, it depends on the situation. But I really look at it is [*sic*] that it's—there's really no—life imprisonment is a better way of doing it, but I'm

---

[8] Each prospective juror completed a questionnaire. For reasons that are not explained in the record, the questionnaire completed by Prospective Juror W.B. is not a part of the record on appeal. His answers, however, are reflected in part in the voir dire conducted by the court. Question 44 of the questionnaire asked, "Do you support or oppose the death penalty?" The trial court's questions during voir dire indicated that W.B.'s answer to question 44 was that he was opposed to the death penalty.

not saying that I couldn't be convinced otherwise, but that's the human side of it." When asked if he had thought it out pretty well, he stated, "I've seen enough death in my life."

The court granted the prosecutor's challenge for cause. Defendant now argues the court erred because even though W.B. voiced opposition to the death penalty, he also indicated he could still impose death in an appropriate case. The record shows that W.B.'s demeanor and attitude as observed by the court revealed more about his opinion regarding the death penalty than what he expressed in words. The court watched him as he was answering questions and decided he was "a man of pretty strong convictions" who did not like to appear to have a closed mind or to speak in absolutes and say "always" or "never," but who, nonetheless, would "unequivocally put [himself] in that absolute extreme position" of always voting against the death penalty. The court concluded W.B. was substantially impaired within the meaning of the applicable law because "realistically and honestly" he would not be able to give the prosecution "a fair hearing and a fair opportunity to at least persuade him to [vote for] the death penalty." In light of substantial evidence in support, we defer to the court's assessment of W.B.'s attitudes and in the decision to excuse him for cause.

## C. *Denial of Challenges for Cause*

Next, defendant argues the court erred in denying his for-cause challenges to seven additional prospective jurors who favored the death penalty.

As noted, a juror may be challenged for cause if his or her views on capital punishment prevent or substantially impair the performance of his or her duties, and the trial court has discretion to assess the juror's qualifications and decide whether to remove the juror for cause. (*People v. Bonilla, supra,* 41 Cal.4th at pp. 338–339.) The reviewing court generally must defer to the judge who sees and hears the prospective juror. (*People v. Lewis and Oliver, supra,* 39 Cal.4th at p. 1007.)

■ "A defendant who claims that the trial court wrongly denied a challenge for cause must demonstrate that his or her right to a fair and impartial jury was affected." (*People v. Garceau* (1993) 6 Cal.4th 140, 174 [24 Cal.Rptr.2d 664, 862 P.2d 664].) "To preserve an objection to the trial court's failure to excuse a juror for cause, a defendant must (1) exercise a peremptory challenge against the juror in question, (2) exhaust all peremptories, and (3) express dissatisfaction with the jury as finally empanelled." (*People v. Bonilla, supra,* 41 Cal.4th at p. 339.) Defendant exhausted his peremptory challenges but did not communicate to the court any dissatisfaction with the jury selected. Accordingly, he failed to preserve the issue for appeal. As

explained in *People v. Weaver, supra,* 26 Cal.4th at page 911, it is possible that, despite counsel's initial misgivings about the composition of the jury, he ultimately was satisfied with the jury as sworn, and, had he expressed dissatisfaction, the trial court may have allowed him to exercise additional peremptory challenges.

In any event, as explained below, his contentions lack merit.

### 1. *Prospective Juror P.M.*

Prospective Juror P.M. supported the death penalty, thought it should be imposed on every defendant who killed intentionally, and thought "it would have to be an awful, awful strong case" on behalf of defendant to sway him from voting for the death penalty. He also indicated that he found it problematic that this case was still in the court after 16 years, asking, "why this gentleman is here. It's horrendous. It's—it's scary to be in a room with [a] man like that." He remembered some of the details of the case from the time of its occurrence in 1979, and thought them to be "pretty grizzly [*sic*]."

The court denied defendant's request to excuse Prospective Juror P.M. for cause, and defendant exercised a peremptory challenge to excuse him. Defendant contends P.M.'s views on the death penalty in general and this case in particular showed he was unable to give him a fair trial.

We conclude the trial court did not abuse its discretion. Initially, P.M. did not know that for death-penalty-eligible crimes, California law allowed for an alternative penalty of life without the possibility of parole, or that the jurors would learn facts about defendant's background, character and history and other factors in mitigation, in addition to the "grisly" facts of the crime he remembered from reports in 1979. After being so instructed by the court, he indicated he could withhold judgment until he had heard all of the evidence, and once he understood that a sentence of life without the possibility of parole meant defendant would never be paroled, he indicated he could consider that sentence. The court did not err in denying defendant's challenge.

### 2. *Prospective Juror P.A.*

As noted, Prospective Juror P.A. supported the death penalty and thought "the punishment should fit the crime." Defendant sought to excuse her for cause, arguing she would automatically vote for the death penalty if she found the crime to be "bad enough." In light of P.A.'s statements that "we all have to have an open mind, and I think I could listen to the evidence with an open mind and then make my decision upon the instructions that you give the jury," and that she would "decide whether somebody has . . . done something

so bad that they deserve to die based on the evidence of this particular case" and "not any other case or anything else," we see no error in the court's denial of the motion to excuse for cause.

### 3. Prospective Juror A.P.

Prospective Juror A.P. indicated in the questionnaire that he both opposed and supported the death penalty, "depending on the case," and clarified during voir dire that he supported the death penalty but would not impose it in every case and that life without the possibility of parole was also a reasonable penalty.

Defense counsel asked him, "Once you've found out it's a deliberate murder, it's not an accident, there's no mental defect here, the person kills another—at that point you have two choices. What I want to know is do you stop right there and say, 'Okay, now it's time for the death penalty,' or do you wait and say, 'No, I want to hear something about the individual himself first'?" He answered, "No, I would stop and say I was for the death penalty."

The prosecutor asked, "[Defense counsel] was concerned that you'd only look at the crime, and if you found it was a certain kind of crime that you would just not look at anything else and say automatically that's the death penalty. Is that your position or not?" A.P. answered, "That's my position only because I don't know how courtrooms are, you know." He indicated that he could render a verdict of death, but it would be "very tough," and that "I would listen to both sides but I don't like to be the judge of someone's future. I don't like disputes." The prosecutor explained the court would ask him to look at the evidence about the murder that was committed, and evidence about the man who committed the murder, and A.P. agreed he would "look at those fairly and rationally."

Defendant argues A.P.'s statements that he could be fair and impartial were only the result of leading questions by the prosecutor, and that any prospective juror would agree to be fair and impartial. We disagree. The trial court reasonably could conclude A.P.'s statements revealed his own concerns and thoughts, and were not merely expressions of agreement with the prosecutor. We see no error in the denial of the motion to excuse him for cause.

### 4. Prospective Juror M.F.

As noted, Prospective Juror M.F. was a mother of eight who homeschooled her younger children, one of whom was an infant still being nursed. She strongly supported the death penalty and explained, "because I believe it to

be the correct punishment for certain crimes. I also believe it's best for an example it shows to others. We must be responsible for *all* of our actions."

She gave inconsistent answers in the questionnaire, stating that she would not return a verdict of death in any murder case without regard to the aggravating or mitigating factors, but she could not think of any case in which she would be willing to return a verdict of life in prison without parole, and she believed the death penalty should be imposed on every defendant who intentionally killed the victim. She explained during voir dire that when filling out the questionnaire she thought a defendant who received any sentence of less than death eventually would be released from prison, and that she made her answers "off the top of her head." After learning that a sentence of life without the possibility of parole means just that, she stated that before deciding on a sentence, she would "really need to weigh the evidence, . . . to hear the story," and she could choose a sentence of life without the possibility of parole if she "thought that was the appropriate choice."

On questioning by defense counsel, M.F. indicated that the robbery, burglary, and kidnapping and killing of a young mother were the type of crimes "that would make me lean in the direction of the death penalty." On questioning by the prosecutor, M.F. agreed there were intentional killings that did not warrant the death penalty, for example, where the father of a murdered child lies in wait and kills the murderer.

The court denied defendant's challenge for cause, explaining that "her answers were ambiguous and inconsistent within the questionnaire," but he was "satisfied she's not substantially impaired by virtue of her strong support of the death penalty. She may be a strong candidate for a peremptory challenge," but was not subject to excusal for cause.

Substantial evidence supports the trial court's ruling. M.F. clearly supported the death penalty, stating that murder during the course of a robbery was the type of case she thought would justify the death penalty and that she would lean toward the death penalty for crimes of robbery, kidnapping and murder of a young mother. She did not, however, state that she would automatically vote for the death penalty. She understood she would be required to listen to and weigh all the evidence, and indicated she could vote for life without the possibility of parole if she thought it was the "appropriate" sentence.

In light of this evidence, we are bound to accept the trial court's determination that M.F. was not subject to excusal for cause. (*People v. Bonilla, supra*, 41 Cal.4th at p. 339.)

### 5. *Prospective Juror S.L.*

Prospective Juror S.L. supported the death penalty but not for every murder case. Question 59 of the questionnaire asked, "Does it make any difference to you that the victim was a white woman and the defendant is an African-American man?" She answered, "As a white woman I would want to know why she was killed." When asked during voir dire to explain why the cross-racial nature of the crime would have such an impact on her, she stated, "I don't know other than the fact that I would probably identify more with her, or might identify more with her because she was white."

Defendant challenged S.L. for cause, arguing that her racial identification with the victim impaired her ability to be a fair and impartial juror. The court denied the challenge, reasoning that most people tend to identify with people of their own age, gender, race, and similar circumstances, but there was no indication that S.L.'s racial identification with the victim would impair her ability to be a fair and impartial juror.

The record supports the court's decision. S.L. revealed during voir dire that she had mixed feelings about the death penalty and had opposed it for many years, but had changed her mind in recent years in light of several disturbing murder cases in San Diego, although she would not support the death penalty in every case. She struggled with her stance on the morality of the death penalty, had spoken to her husband and her fellow church members about it, and admitted she found it very difficult to write down in words her thoughts about the death penalty. She acknowledged initially she thought defendant should be put to death because he had already been convicted of the murder, but she indicated she knew very little about the case and might be persuaded to vote for life without the possibility of parole once she learned more. She stated, "I'm still wavering. I would have to hear everything." She also indicated that since the beginning of the jury selection process, she had been focusing on what happened to the victim and wondering what were the facts of the case.

A reasonable inference to be drawn from S.L.'s questionnaire answer is that it reflected not a racial bias that would impair her ability to be a fair and impartial juror but, rather, an acknowledgment that there were cross-racial elements in the crime and that she may have had questions as to whether race played a role in the murder. She apparently gave serious consideration to the morality of the death penalty, but the record does not reveal that any of her indecision was based on racial bias.

### 6. *Prospective Juror D.O.*

Prospective Juror D.O. indicated in the questionnaire that he both supported and was undecided about the death penalty. He explained that "up

until the past five or six years, [I] was opposed to the death penalty. I sort of felt it served no purpose, it wasn't a deterrent. Maybe I'm getting older, more conservative. There are circumstances where people just revoke their rights to citizenship, revoke their rights to life by actions they have done." As noted earlier, D.O. cited as an example of the type of case that in his mind would always deserve the death penalty the Oklahoma City bombing and cases where children were killed, and explained further that "where someone takes the life of someone coldly and maliciously, I would have to assume for first degree murder. That person most likely should be put to death." When the court explained to him that under the law not all first degree murderers are eligible for the death penalty, and in no case is the death penalty mandatory but the jury is always charged with choosing between life without the possibility of parole and the death penalty, D.O. stated that his mind would be open, he would "try to adhere to the law," would "listen to the evidence" and from what he knew about this case, he "would probably be leaning towards the death penalty" but "that doesn't mean I will find the death penalty."

Contrary to defendant's assertions, the record does not support an inference that D.O. would invariably vote for death in every case of an intentional killing. D.O.'s attitudes were in conflict, and although he had strong feelings about holding murderers responsible for their actions and he was "leaning towards the death penalty," he assured the court he would consider the facts and circumstances of the case before making a decision as to punishment. The record supports the court's decision to deny the challenge for cause.

### 7. *Prospective Juror D.A.*

Prospective Juror D.A. strongly supported the death penalty. In her questionnaire she gave conflicting responses, both that she would consider evidence in mitigation and aggravation before imposing the death penalty and that she thought the death penalty should be imposed on every defendant who intentionally kills the victim. She could not conceive of any case in which the defendant was eligible for the death penalty but in which she would be willing to return a verdict of life without the possibility of parole. During voir dire, she offered different answers, stating not only that she believed the death penalty should not be imposed on every defendant who intentionally killed the victim, but also that "I just feel like when people take another person's life, they should recognize at that time that they are doing this and that they should be willing to give up theirs, too." She did not think her views on the death penalty were so strong that she would be unable to listen to and evaluate additional evidence beyond that associated with the crime itself, and she could realistically conceive of voting for a sentence other than death once she knew more about the facts and circumstances of the case.

Defendant challenged Prospective Juror D.A. for cause, arguing her view that "if you take a life, you should be willing to give up yours" indicated she would invariably vote for death for an intentional killing. The court disagreed, reasoning that in making that statement D.A. apparently meant that, to her, " 'you, the offender, should be willing to give yours up,' [means] realize at least that—you run that risk. That may be the result. I don't think that necessarily translates into always without exception the death penalty."

Because it finds support in the record, we are bound by the trial court's assessment of D.A.'s true state of mind when she made this statement. (*People v. Bonilla, supra*, 41 Cal.4th at p. 339.) We therefore defer to the court's conclusion that D.A.'s views on the death penalty did not impair her ability to be a fair and impartial juror. (*People v. Lewis and Oliver, supra*, 39 Cal.4th at p. 1007.)

### D. *Batson/Wheeler*

#### 1. *Background*

After the excusal of prospective jurors for hardship and for cause, 77 prospective jurors remained from the original venire panel of 300. Of those 77 prospective jurors, six were Black. Before the commencement of peremptory challenges, defendant, who is Black, filed a motion he had written himself in which he sought to preemptively challenge the exclusion from the jury of "a cognizable group within the community," citing *People v. Wheeler* (1978) 22 Cal.3d 258, 272 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*). The prosecutor acknowledged that the motion also raised issues regarding defendant's federal constitutional rights under *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*). The court informed defendant that his motion was premature and instructed him to renew the motion when the prosecution made an objectionable peremptory challenge. The court also warned both parties that the first challenge to a Black prospective juror likely would not be enough to establish a design or pattern of discrimination, but that the prosecutor should be prepared, in any event, to offer a race-neutral justification for a challenge to a Black prospective juror.

The prosecutor peremptorily challenged all six of the Black prospective jurors who were called into the jury box for general voir dire; defendant renewed the *Batson/Wheeler* motion at each instance. No Black jurors served on the jury sworn to hear defendant's case.

Defendant now renews his contention that the prosecutor used peremptory challenges to excuse the six Black prospective jurors based solely on their race and the trial court erred in denying his *Batson/Wheeler* motions, thereby violating his constitutional rights to due process, equal protection, and a fair and impartial jury.

■ It is well settled that "[a] prosecutor's use of peremptory challenges to strike prospective jurors on the basis of group bias—that is, bias against 'members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds'—violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution. (*Wheeler, supra,* 22 Cal.3d at pp. 276–277; see *People v. Griffin* (2004) 33 Cal.4th 536, 553 [15 Cal.Rptr.3d 743, 93 P.3d 344].) Such a practice also violates the defendant's right to equal protection under the Fourteenth Amendment to the United States Constitution. (*Batson, supra,* 476 U.S. at p. 88; see also *People v. Cleveland* (2004) 32 Cal.4th 704, 732 [11 Cal.Rptr.3d 236, 86 P.3d 302].)" (*People v. Avila* (2006) 38 Cal.4th 491, 541 [43 Cal.Rptr.3d 1, 133 P.3d 1076].)

■ The United States Supreme Court recently reaffirmed the procedure and standard to be used by trial courts when *Batson* motions challenging peremptory strikes are made. " ' "First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race[; s]econd, if that showing has been made, the prosecution[ must offer a race-neutral basis for striking the juror in question[; and t]hird, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination." ' [Citation.]" (*Snyder v. Louisiana* (2008) 552 U.S. 472, 476–477 [170 L.Ed.2d 175, 128 S.Ct. 1203, 1207].)

### 2. *Failure to Find a Prima Facie Case as to First Challenge to a Black Prospective Juror*

The prosecutor exercised his second peremptory challenge to excuse L.F., the only Black in the first group of 20 prospective jurors. Defendant renewed his *Batson/Wheeler* motion, arguing that the challenge to the only Black prospective juror under consideration, standing alone, was sufficient to establish a prima facie case of discrimination. The court ruled defendant had not made a prima facie showing and denied the motion. The court nonetheless invited the prosecutor to give a further explanation of his reasons for challenging L.F.[9]

■ Defendant now argues the trial court applied the wrong legal standard in denying the motion. We disagree. In the first stage of an inquiry under

---

[9] The court asked the prosecutor to give his reasons "as a practical matter" "while everything is fresh in everybody's mind" since the prosecutor had indicated he was going to be ready from the outset to justify whatever challenges there might be. The prosecutor explained he excused L.F. because her son spent three years in prison for a violent crime and when discussing the crime during voir dire, she tried to minimize his culpability and excuse his actions by blaming the victim; and he thought she was not "sharp enough to handle this case," based on the numerous spelling errors he found in her questionnaire. In denying the motion, the court indicated it did not take into account the prosecution's justification for the excusal since the defendant had not made a threshold showing for a prima facie case.

*Batson/Wheeler*, the burden rests on the defendant to " 'show[] that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' " (*Johnson v. California* (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129, 125 S.Ct. 2410]; accord, *Miller-El v. Dretke* (2005) 545 U.S. 231, 239 [162 L.Ed.2d 196, 125 S.Ct. 2317]; *Batson, supra*, 476 U.S. at p. 96.) Contrary to defendant's assertion that the trial court had required him to show "a strong likelihood" that the prosecution challenged L.F. with discriminatory purpose, the court correctly looked for "evidence from . . . which one might draw certain inferences" of discrimination, and found none. The court reasoned that a pattern of discrimination was circumstantial evidence from which one might draw inferences, but correctly rejected defendant's argument that the challenge of the only Black person subject to challenge was sufficient in and of itself to suggest a pattern. (See *People v. Bonilla, supra*, 41 Cal.4th at pp. 342–343 [the challenge of one or two jurors rarely suggests a *pattern* of impermissible exclusion].) The trial court properly found no prima facie case of discriminatory intent with the challenge of L.F.

### 3. *Denial of* Batson/Wheeler *Motions After Finding a Prima Facie Case of Discrimination*

The prosecutor thereafter challenged the second and third Black prospective jurors, A.M. and S.B., who were the only two Black prospective jurors in the group then under consideration. Defendant again renewed the *Batson/Wheeler* motion. The trial court found defendant had made a prima facie showing of discriminatory purpose in the challenge of the second and all subsequent Black prospective jurors, and asked the prosecutor to give his reasons for the challenges.[10]

The prosecutor explained he had several reasons for challenging Prospective Juror A.M.: in his view, A.M. came from a family that did not have "an abiding respect for the rule of law" and was not smart enough to serve on the jury. Moreover, A.M. had "considerable sympathy for Black people on trial" and thought the justice system was unfair to Blacks. Next, the prosecutor explained he challenged S.B. because she was young, single, less sophisticated and less mature than was his ideal juror; she was opposed to the death penalty and found it to be "the easy way out"; and she harbored a "wholly naïve view of the criminal mind."

The court found that the reasons stated were not constitutionally infirm and denied the *Batson/Wheeler* motion.

---

[10] Defendant did not ask the court to reconsider whether the excusal of L.F. was made with discriminatory intent, and the court was not required to do so sua sponte. (See *People v. Avila, supra*, 38 Cal.4th at p. 552 [although the court has no sua sponte duty to revisit earlier *Batson/Wheeler* challenges that it had previously denied, upon request it appropriately may do so].)

The prosecutor thereafter challenged Prospective Juror C.B., the fourth Black prospective juror, because of her unkempt and slovenly appearance, because she was unemployed and the unwed 33-year-old mother of a 14-year-old boy, because she harbored hostility toward the police, and because she felt the death penalty law treated Black people unfairly. The court found these explanations established race-neutral reasons for the challenges and denied the *Batson/Wheeler* motion.

The prosecutor thereafter challenged Prospective Juror B.H., the fifth Black prospective juror, because of her youth and status as an unmarried mother of a two-and-a-half-year-old child.

The court accepted this explanation, though it commented, "I think [the prosecutor's] credibility is beginning to wear a little thin."

Finally, the prosecutor challenged Prospective Juror M.M., the sixth Black prospective juror, explaining that she was acquainted with one of the defense witnesses, expressed some hostility toward the police, had a history of arrest, had family members in prison, and had reservations about imposing the death penalty. The court found these reasons to be race neutral and denied the *Batson/Wheeler* motion.

Defendant argues the court erred in finding the prosecution's reasons to be race neutral.

■ "[T]he question presented at the third stage of the *Batson* inquiry is ' "whether the defendant has shown purposeful discrimination." ' [*Miller-El v. Dretke*, 545 U.S. at p. 277 [125 S.Ct. 2317].]" (*Snyder v. Louisiana, supra*, 552 U.S. at p. 485 [128 S.Ct. at p. 1212].) "[T]he critical question in determining whether [a party] has proved purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for his peremptory strike." (*Miller-El v. Cockrell* (2003) 537 U.S. 322, 338–339 [154 L.Ed.2d 931, 123 S.Ct. 1029].) The credibility of a prosecutor's stated reasons "can be measured by, among other factors . . . how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." (*Id.* at p. 339.)

The existence or nonexistence of purposeful racial discrimination is a question of fact. (See *Miller-El v. Cockrell, supra*, 537 U.S. at pp. 339–340.) We review the decision of the trial court under the substantial evidence standard,[11] according deference to the trial court's ruling when the court has

---

[11] The United States Supreme Court recently indicated that "[o]n appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is *clearly erroneous*" (*Snyder v. Louisiana, supra*, 552 U.S. at p. 477 [128 S.Ct. at p. 1207], italics added, citing

made a sincere and reasoned effort to evaluate each of the stated reasons for a challenge to a particular juror. (*People v. Jurado* (2006) 38 Cal.4th 72, 104–105 [41 Cal.Rptr.3d 319, 131 P.3d 400], citing *People v. McDermott* (2002) 28 Cal.4th 946, 971 [123 Cal.Rptr.2d 654, 51 P.3d 874]; *People v. Cash, supra,* 28 Cal.4th at p. 725.) "[T]he trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's race-neutral reason for exercising a peremptory challenge is being accepted by the court as genuine." (*People v. Reynoso* (2003) 31 Cal.4th 903, 919 [3 Cal.Rptr.3d 769, 74 P.3d 852].) "We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]" (*People v. Burgener* (2003) 29 Cal.4th 833, 864 [129 Cal.Rptr.2d 747, 62 P.3d 1].) A prosecutor's reasons for exercising a peremptory challenge "need not rise to the level justifying exercise of a challenge for cause." (*Batson, supra,* 476 U.S. at p. 97.) " '[J]urors may be excused based on "hunches" and even "arbitrary" exclusion is permissible, so long as the reasons are not based on impermissible group bias.' " (*People v. Box* (2000) 23 Cal.4th 1153, 1186, fn. 6 [99 Cal.Rptr.2d 69, 5 P.3d 130].)

### a. Prospective Juror A.M.

The first reason given by the prosecutor to justify his challenge to A.M. was that A.M. came from a family that did not have "an abiding respect for the rule of law." Substantial evidence supports the statement, and the trial court could reasonably conclude it was race neutral: During voir dire, A.M. revealed his brother was in prison, and his daughter had been arrested for receiving stolen property and evidently had been prosecuted by the San Diego County District Attorney's Office.

The next reason given by the prosecutor was that A.M. had "considerable sympathy for Black people on trial" and thought the justice system was unfair to Blacks. Defense counsel argued that rather than being race neutral, the challenge of A.M. because of his attitudes about the treatment of Blacks in the justice system was itself race based. The court correctly ruled that a challenge based solely on the prospective juror's race is different from

*Hernandez v. New York* (1991) 500 U.S. 352, 369 [114 L.Ed.2d 395, 111 S.Ct. 1859] [*Batson's* treatment of intent to discriminate is a pure issue of fact, subject to review under the "clearly erroneous" deferential standard]). We have held that our "substantial evidence" standard for review of pure issues of fact is equivalent to the federal "clearly erroneous" standard. (*People v. Mickey* (1991) 54 Cal.3d 612, 649 [286 Cal.Rptr. 801, 818 P.2d 84]; see *People v. Louis* (1986) 42 Cal.3d 969, 984–988 [232 Cal.Rptr. 110, 728 P.2d 180].)

a challenge "which may find its roots in part [in] the juror's attitude about the justice system and about society which may be race related." (See *People v. Lewis and Oliver, supra,* 39 Cal.4th at p. 1016 [a party does not offend *Batson* or *Wheeler* when it challenges prospective jurors who have shown orally, in writing, or through conduct in court, that they personally harbor biased views].) Substantial evidence supports the statement, and the trial court reasonably could conclude it was race neutral: A.M. did not expressly state as much, but his answers to three questions on the juror questionnaire indicate he harbored a skepticism regarding the fairness of the treatment of Blacks within the criminal justice system. Question 57 asked, "Do you believe the death penalty law is administered fairly with respect to [Black men]?" A.M. did not check either the "Yes" or "No" response, but wrote, "Will all the facts be brought out for the jury?" When asked in question 58 to explain why he thought Blacks make up a larger percentage of the prison population than of the general population, A.M. answered, "In some cases the law is bias [*sic*]." Finally, question 75 asked, "What do you believe are the major causes of crime in our society?" A.M. answered, "Society bias. Parents give a care attitude [*sic*]."

The final reason given by the prosecutor was that A.M. had not risen above the rank of Petty Officer First Class after serving 20 years in the Navy. The prosecutor suggested that the reason for that was either A.M. was not smart enough to pass the tests that would have allowed him to rise in the ranks, or he may have felt he was discriminated against in the Navy because of his race, which the prosecutor linked to A.M.'s attitudes toward the treatment of Blacks in the justice system. The record reflects that A.M. did not graduate from high school and spent 20 years in the Navy as a Petty Officer First Class. Viewing these characteristics of A.M. in the light of his answers pertaining to his family's legal difficulties and his apparent sympathy for a Black defendant, the trial court's ruling that challenge of A.M. was unrelated to his race is supported by substantial evidence.

The comparative juror analysis defendant suggests[12] does not further his claim. He suggests that seated Juror J.R., who was not Black, harbored an attitude similar to that of A.M. regarding the role race plays in the judicial system. He points to the portion of the record where the prosecutor discussed with the entire panel the verdict in the O.J. Simpson trial and the racial issues that arose therein. The prosecutor asked if there were any jurors for whom "the situation in the O.J. Simpson verdict caused you to rethink your position

---

[12] Comparative juror analysis must be performed for the first time on appeal on review of claims of error at *Batson/Wheeler*'s third stage, as here, when the defendant relies on such evidence, and when the record is adequate to permit the comparisons. (See *People v. Lenix* (2008) 44 Cal.4th 602, 607 [80 Cal.Rptr.3d 98, 187 P.3d 946].) The reviewing court need only consider responses by stricken panelists or seated jurors identified by the defendant in the claim of disparate treatment. (*Id.* at p. 624.)

regarding this case? . . . That was a Black jury. Here as you look around you see this is a predominantly White jury. Anybody here that thinks race may play a role in this case?" J.R. answered, "The question I have is, if an all White jury would be truly of Mr. Hamilton's peers?" The court explained that J.R. should not be concerned with that fact "unless you think that would prevent you from being . . . a fair and impartial juror." J.R. replied, "It will not affect my decision. It was a question I had." Defendant asserts J.R.'s question revealed an attitude about race and the judicial system that was no different from that harbored by A.M.

Not so. J.R.'s question revealed a curiosity about how the law defines "a jury of one's peers," and, inferentially, a concern that an all-White jury might treat defendant differently than a diverse jury. The record reveals that A.M.'s attitude toward race and the judicial system was not just a curiosity or a concern, but amounted to a belief that the law and society were biased, and a lack of trust that the justice system would bring to light all the facts regarding a Black defendant. Comparing A.M. to J.R., therefore, does not show that the prosecutor challenged a Black juror who possessed the same characteristics as did a non-Black juror he did not challenge.

### b. *Prospective Juror S.B.*

The prosecutor stated he challenged S.B. because she was young and single. The record reveals S.B. was 22 years old and unmarried. The prosecutor explained he did not want unsophisticated, immature jurors, since he thought the case would "definitely appeal more to married people and particularly married people with children." His ideal juror would be between the ages of 40 and 65, although he would accept otherwise acceptable jurors who were over 30 years of age.

We need not examine the objective reasonableness of the prosecutor's stated basis for the challenge of S.B., namely his desire to exclude younger jurors. The proper focus of a *Batson/Wheeler* inquiry is on the subjective *genuineness* of the race-neutral reasons given for the peremptory challenge, *not* on the objective *reasonableness* of those reasons. (See *People v. Reynoso, supra*, 31 Cal.4th at p. 917, citing *Purkett v. Elem* (1995) 514 U.S. 765, 769 [131 L.Ed.2d 834, 115 S.Ct. 1769] [the prosecutor's reason for thinking a prospective juror would not make a good juror in the case—that the prospective juror had long, unkempt hair, a mustache, and a beard—constituted a valid nondiscriminatory reason for exercising the challenge].) What matters is that the prosecutor's reason for exercising the peremptory challenge is legitimate. A " 'legitimate reason' is not a reason that makes sense, but a reason that does not deny equal protection. [Citations.]" (514 U.S. at p. 769.) Neither the United States Supreme Court nor this court has held

that the exercise of peremptory strikes on the basis of age violates the Constitution. (*U.S. v. Maxwell* (6th Cir. 1998) 160 F.3d 1071, 1075; *People v. Ayala* (2000) 24 Cal.4th 243, 278 [99 Cal.Rptr.2d 532, 6 P.3d 193].) There is nothing in the record to indicate that the prosecutor's desire for a more mature jury was not genuine.

Substantial evidence also supports the prosecutor's contentions that S.B. was opposed to the death penalty and harbored a "wholly naïve view of the criminal mind," and the trial court reasonably could conclude they were race neutral. S.B. wrote in her questionnaire that she opposed the death penalty because she felt "it is the easy way out for a person who committed a crime. If one is guilty then I believe that he or she should get life in prison. So they can remember for the rest of their lives, the crime that he or she has committed." In voir dire, she elaborated, "I think either way it would be the easy way out, whether he was in jail or if he died, because if he had no conscience he really wouldn't care where he was at the time."

Thus, S.B.'s questionnaire and voir dire answers suggested she was not in the prosecutor's ideal age group, and might not be inclined to agree with his argument that the death penalty was the most severe of punishments.

The comparative juror analysis defendant suggests does not further his claim. He points out the prosecutor did not challenge Alternate Juror J.S. even though, at age 23, she was only a year older than S.B., whom the prosecutor found objectionable at age 22. The record, however, reveals that unlike S.B., J.S. had characteristics apart from her age that were positive factors in the prosecutor's assessment of an ideal juror: J.S. was married and supported the death penalty. Comparing S.B. to J.S., therefore, does not show that the prosecutor challenged a Black juror who possessed the same characteristics as did a non-Black juror he did not challenge. Thus, substantial evidence supports the trial court's determination that the prosecutor challenged S.B. for reasons not related to her race.

### c. *Prospective Juror C.B.*

The prosecutor explained he challenged C.B. because she was unkempt and slovenly in appearance, she was unemployed and the unwed 33-year-old mother of a 14-year-old boy, she harbored hostility toward the police and favoritism toward the defense, and she felt that the death penalty law treated Black people unfairly.

Substantial evidence supports the prosecutor's contentions, and the trial court reasonably could conclude they were race neutral. According to the prosecutor, C.B. stood out from all the other jurors because "[s]he dressed in

a way which is extraordinary for somebody of her age. She's 33 years old but she dressed like a 15-year-old, with baggy clothes . . . very unkempt and slovenly looking person." We can assume this description was accurate, as neither the court nor defense counsel challenged it.

The record reveals C.B. did not respond to question 44, which asked if she supported or opposed the death penalty, but later indicated that she would support the death penalty "depending on the circumstances that led up to the crime." She answered only "Confidential" to question 57, which asked if she thought the death penalty was administered fairly with respect to Blacks, and to question 58, which asked her to explain why Blacks make up a larger percentage of the prison population than of the general population. She explained further during voir dire that she thought the number of Blacks in prison "probably has a lot to do with the way Blacks are treated and are still treated, and probably a lot of themselves [sic]." When asked in question 83 what she thought was the role of a defense attorney, she wrote, "I hope he knows what he's doing." She explained during voir dire that she meant, "I don't put much hope in the legal system." When asked during voir dire why she did not give an answer to question 82, which asked her attitude toward the prosecuting attorney, she answered, "Probably didn't pay attention to— just wanted to get out of here."

The record thus suggests that C.B.'s appearance revealed characteristics legitimately undesirable to the prosecutor, and her answers hinted she might have harbored a bias in favor of a Black defendant and against the prosecution. Thus, substantial evidence supports the trial court's ruling that the prosecutor challenged C.B. for reasons unrelated to her race.

### d. *Prospective Juror B.H.*

The prosecutor explained he challenged B.H. because of her youth and her status as a single mother.

Substantial evidence supports the prosecutor's contentions, and the trial court reasonably could conclude they were race neutral. B.H. was 24 years old and the unmarried mother of a two-and-a-half-year-old child. She was therefore younger than the prosecutor's ideal juror, and would not appear to represent traditional "family values" as did Eleanore and Terry Buchanan.

The comparative juror analysis defendant suggests does not further his claim. He points to C.M., who was White and who served as a juror. C.M. indicated in the questionnaire that she had been married and divorced twice and was then "living with [a] domestic partner or significant other." Defendant argues that, by "living out of wedlock," C.M., like B.H., also failed to

represent the traditional "family values" the prosecutor sought in his ideal jurors. The record reveals, however, that C.M. had other characteristics that were positive factors in the prosecutor's assessment of an ideal juror: She was 44 years old and supported the death penalty. Comparing B.H. to C.M., therefore, does not show that the prosecutor challenged a Black juror who possessed the same characteristics as did a White juror he did not challenge.

Thus, substantial evidence supports the trial court's ruling that the prosecutor challenged B.H. for reasons unrelated to her race.

### e. *Prospective Juror M.M.*

The prosecutor explained he challenged M.M. because she was acquainted with one of the defense witnesses, expressed some hostility toward the police, had a history of arrest, had family members in prison, and had reservations about imposing the death penalty.

Substantial evidence supports the prosecutor's contentions, and the trial court reasonably could conclude they were race neutral. M.M. indicated that defense witness Reverend Forest Hancock had officiated at her fiance's funeral. While her nephew was living with her, police had arrested but not charged M.M. for possession of a stolen handgun. At the time of jury selection, one of her nephews was in prison in Texas for murder, and a second nephew was in jail in San Diego on drug charges. She indicated she would "feel more comfortable" if someone other than herself made the decision regarding the imposition of the death penalty and she agreed with the prosecutor's assessment that she had "serious reservations about [her] ability to impose the death penalty on anybody, even though [she] support[ed] it."

The record thus suggests M.M. might be sympathetic to a defendant whom the police had arrested for a crime but who professed his innocence, or who was charged with a crime of violence, and might have difficulty returning a death verdict, all characteristics that would not appeal to the prosecution.

Thus, substantial evidence supports the trial court's ruling that the prosecutor challenged M.M. for reasons unrelated to her race.

### 4. *Trial Court's Evaluation of Prosecutor's Reasons*

Finally, defendant claims the trial court failed to make a careful assessment of the prosecutor's stated reasons for challenging the Black prospective jurors and instead simply accepted the prosecutor's rationale. We disagree.

When ruling on a *Batson/Wheeler* motion, the trial court must make "a sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case as then known, his knowledge of trial techniques, and his observations of the manner in which the prosecutor has examined members of the venire and has exercised challenges for cause or peremptorily . . . ." (*People v. Hall* (1983) 35 Cal.3d 161, 167–168 [197 Cal.Rptr. 71, 672 P.2d 854].) The court need not make affirmative inquiries, but must determine whether the prosecutor's reason for exercising peremptory challenges is sincere and legitimate in the sense of being nondiscriminatory. (*People v. Reynoso, supra,* 31 Cal.4th 903, 920, 924.)

At the third stage of the *Batson/Wheeler* inquiry, " 'the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' (*Miller-El* [*v. Cockrell*], *supra,* 537 U.S. at p. 339.) In assessing credibility, the court draws upon its contemporaneous observations of the voir dire. It may also rely on the court's own experiences as a lawyer and bench officer in the community, and even the common practices of the advocate and the office who employs him or her. (See *Wheeler, supra,* 22 Cal.3d at p. 281.)" (*People v. Lenix, supra,* 44 Cal.4th 602, 613, fn. omitted.) "When reasons are given for the exercise of challenges, an advocate must 'stand or fall on the plausibility of the reasons he gives.' [Citation.] The plausibility of those reasons will be reviewed, but not reweighed, in light of the entire record. [Citation.]" (*Id.* at p. 621.)

Defendant first argues the court failed to conduct a sincere and reasoned evaluation of the prosecutor's explanation that he challenged B.H. because she was a young, single mother. Not so. The court listened to the lengthy arguments offered by both parties,[13] accepted the prosecutor's explanation as to why he challenged B.H. but did not challenge A.P., who was also under the age of 30, but thereafter warned the prosecutor, "I think [your] credibility is beginning to wear a little thin . . . on these explanations. I'll accept this one. I still think we're not at a point where I can say it's constitutionally infirm because it was based solely on race but getting close, getting close." This

---

[13] The prosecutor explained why he did not want any jurors under the age of 30, and why he considered B.H. to be too immature, emotionally unconnected and bereft of sufficient life experience to be a juror on this case. The defense questioned the genuineness of that explanation and pointed out that the prosecution had not challenged Prospective Juror A.P., who, at 25 years old, was also younger than the prosecutor's ideal juror. The prosecutor explained the decision to pass on A.P. was a tactical one aimed at forcing the defense to use a peremptory challenge to excuse him. The defense had unsuccessfully moved to excuse A.P. for cause, and the prosecutor correctly guessed that the defense would not leave him on the jury but would peremptorily excuse him.

warning by the court reveals, not that the court abdicated its responsibility and accepted the prosecutor's rationale, as the defense would have us conclude, but rather that the court listened to the arguments and weighed the facts known about B.H. against the prosecutor's desires to have a mature jury, and decided that, although it was a close call, the prosecutor's reasons were legitimate.

Defendant next argues the court failed to conduct a sincere and reasoned evaluation of the prosecutor's explanation that he challenged A.M. because he came from a family that did not have an abiding respect for the rule of law, had considerable sympathy for Black people on trial, and was not smart enough to serve as a juror on this case. Not so.

The record reveals that the court initially characterized A.M. as a pro-death-penalty juror who, "at least on the surface," would be attractive to the prosecution. The prosecutor explained that he, too, found A.M. to have characteristics that were both attractive and unattractive to both parties and while he had intended to try to gain a tactical advantage over the defense by initially passing on A.M. and letting the defense use a peremptory challenge to excuse him, he made a mistake and challenged A.M. early on in the selection process. He nevertheless defended the challenge, explaining that he was ultimately moved to challenge A.M. when he reviewed his answers related to racial bias in the justice system and decided "he has a racial issue that makes him a very dangerous juror for me." The court then pointed out that A.M.'s attitudes on race in the justice system were set out in writing in his answers in the questionnaire and were therefore "something more than sheer speculation." We infer from this statement that the court reviewed the prosecutor's reasons and decided they were legitimate.

Finally, defendant argues the court failed to make a sincere and reasoned evaluation of the prosecutor's explanation that he challenged M.M. because she had reservations about imposing the death penalty. Not so. When the prosecutor stated that M.M. "has very serious reservations about imposing the death penalty on anyone," the court challenged the prosecutor's memory, stating, "I didn't recall that" and "in my own review of her questionnaire I had her indicated as supportive of the death penalty." The prosecutor referred the court to the transcript where M.M. stated, "I would just feel more comfortable if someone else did it," and where she answered, "Right" to his question, "I understand that answer to mean you have serious reservations about your ability to impose the death penalty on anybody, even though you support it?" The court acknowledged that the prosecutor "may have read certain reactions on her part differently than you and I did," but stated, "I don't think I have any legitimate reason to question his . . . impression, despite what she said in the questionnaire, for her personally to actually do it

would be difficult. I'm not in a position to counter that. I came to the same conclusion you did I think from reading the questionnaire." We infer from this record that the court listened to M.M. and read her questionnaire, formed its own opinion about her qualifications, challenged the prosecutor's interpretation of her answers in voir dire, and thereafter acknowledged that the record could support the prosecutor's position. In doing so, the court reviewed the plausibility of the prosecutor's stated reasons and decided they were legitimate.[14]

## III. TRIAL

### A. Trial Court's Refusal to Allow Evidence of Inconsistent Theories of Guilt

Defendant next argues the trial court erred in not allowing him to ask the prosecutor or the defense counsel from the first trial questions regarding the prosecution's theory at that trial about how the killer placed the victim's body within the Buchanans' van when he transported it to Pine Valley. He argues the theory in the first trial differed significantly from that of the penalty retrial, and exposure of the alleged differences, and therefore exposure of the weaknesses in the prosecution's case, was relevant to his defense of lingering doubt. Exclusion of this evidence, he argues, violated his rights to due process, a fair trial, and a reliable penalty verdict.

The trial court did not abuse its discretion in concluding that the proffered evidence was irrelevant.

Defendant's lingering doubt defense rested in large part on his challenges to the prosecution's forensic evidence. He presented evidence at the penalty

---

[14] Hamilton also argues the trial court erred by applying too lenient a standard to its assessment of the prosecution's motives, requiring Hamilton to demonstrate that race was the "sole" motive behind each peremptory strike. While it is true that the trial court at various points explained it was allowing peremptories because it concluded they were not based "solely on race," our careful review of the context of these statements leads us to conclude the trial court was not expressing a belief that race was one among several motives for these peremptories. Instead, it appears in each instance that the trial court considered whether race or the prosecution's proffered justification better explained the challenged peremptory, concluded the proffered justification was not pretextual, and on that basis denied the Batson/Wheeler motion. As substantial evidence supports the trial court's conclusions, it is unnecessary to consider here whether the trial court erred in failing to apply a mixed-motive analysis to any of the challenged peremptories. (See People v. Schmeck (2005) 37 Cal.4th 240, 276–277 [33 Cal.Rptr.3d 397, 118 P.3d 451] [finding it unnecessary in light of the record to decide whether a mixed-motive peremptory challenge could constitute a constitutional violation]; cf. Snyder v. Louisiana, supra, 552 U.S. at p. 485 [128 S.Ct. at p. 1212] [recognizing open question whether mixed-motive precedents applied to Batson claim, but finding it unnecessary to resolve question where discriminatory intent was at least a "but for" cause for the challenged strike].)

retrial regarding the efforts of his investigators and attorneys to recreate the scene in which the decapitated body was placed in the van in the only position they assumed was possible for the body to have deposited the blood where it was found under the couch seat; their conclusions that such placement would have left injuries and marks on the body; and evidence that the body did not have such injuries and marks. Defendant offered the opinion of Criminalist Joseph Orantes that, based on the patterns of blood within the van, the lack of particular markings that should have been left on the body had it been pressed against the wheel well or spare tire, the small number of fibers found on the body, and the configuration of the seats and wheel well within the van, the victim's body could not have been transported in the van *on top of* the wheel well, as described by prosecution Criminalist Brandon Armstrong, because the body would not fit on the wheel well and still allow the couch seat to be lowered to a seated position. Orantes offered his opinion that the amount and placement of blood in the wheel well was more consistent with the perpetrator's having transported only the victim's head in the van. Defendant offered a theory that the real killer or killers transported the body to Pine Valley in another vehicle and put the head and hands under the van's couch seat while en route to dispose of them in a separate location, but shortly thereafter abandoned the van when it ran out of gas; defendant was merely unlucky enough to have stolen the van after it had been abandoned on Tait Street by the killers.

The prosecution's theory at the penalty retrial was that defendant transported the victim's body to Pine Valley in the Buchanans' van. Criminalist Brandon Armstrong testified the blood left in the van and on defendant's shoe was consistent with that of the victim; the blue fibers found on the victim's abdomen, feet and exposed bone were consistent with the carpet in the van; and the patterns of blood inside the van were consistent with the victim's body being placed on top of the wheel well or spare tire inside the van during transportation. In his opinion, there was enough room to place a body on top of the spare tire in the space beneath the couch seat to allow the couch seat to be fully lowered to a seated position, in effect concealing the body inside the van.

Defendant contended that this theory in the penalty retrial, that the body was placed *on top of* the wheel well or spare tire, differed significantly from that in the first trial, where, defendant asserts, the prosecution theorized "the body was laying on its stomach in the van . . . . And the neck and shoulders were raised *up against the wheel well*. That is why the blood is there." The prosecution objected when defendant attempted to ask both Frank Sexton, the prosecutor in the first trial who testified for the prosecution in the penalty retrial, and Thomas Ryan, defense counsel in the first trial who testified for defendant at the penalty retrial, questions regarding the prosecution's theory

in the first trial about how the killer placed the body inside the van. The court found the proffered evidence to be irrelevant and sustained the objections.

Defendant now argues the court erred in not allowing him to expose "the inconsistent theories of guilt" between the first trial and the penalty retrial. He cites as authority *U.S. v. GAF Corp.* (2d Cir. 1991) 928 F.2d 1253, 1260, which held, "Confidence in the justice system cannot be affirmed if any party is free, wholly without explanation, to make a fundamental change in its version of the facts between trials, and then conceal this change from the final trier of the facts."

The trial court did not err. Contrary to defendant's argument, the evidence in the first trial was not "substantially different" from that in the penalty retrial, nor did the prosecution present inconsistent theories of guilt in the two trials. The prosecution's argument that the killer transported the body in the van did not rely on a precise determination of how he placed the body within the van. The prosecutor in the penalty retrial acknowledged as much in closing argument when he stated, "We don't know exactly how—we don't know exactly what was done with the head or the hands, nobody has ever seen them. And it's very possible, in fact likely, that the body, the head and the hands were all transported in that van. There's no reason whatsoever that you couldn't lay the body out there, put the head there and maybe one of the hands. . . . Did the body rest on the spare tire? Again we don't know for sure. There's some indication that it did." The prosecution's theories in the first trial and the penalty retrial—that the killer transported the body to Pine Valley in the van—remained consistent. The evidence at the first trial and the penalty retrial—Brandon Armstrong's testimony that the blood in the van was that of the victim and the fibers on the victim's body were from the van—remained consistent. The prosecution did not make a fundamental change in its version of the facts between trials. The court did not, therefore, err in refusing to allow evidence or argument regarding inconsistent theories of guilt.

## B. *Exclusion of Evidence Designed to Raise Lingering Doubt*

Defendant next asserts the trial court erred in excluding significant evidence relevant to his defense of lingering doubt. He argues the error violated his federal and state constitutional rights to due process, to present a defense, to compulsory process, and to a fair and reliable determination of penalty. We disagree.

Although a capital defendant has no federal constitutional right to have the jury consider lingering doubt in choosing the appropriate penalty (*People v. Gay* (2008) 42 Cal.4th 1195, 1220 [73 Cal.Rptr.3d 442, 178 P.3d

422]), evidence of the circumstances of the offense, including evidence that may create a lingering doubt as to the defendant's guilt of the offense, is admissible at a penalty retrial as a factor in mitigation under section 190.3 (*People v. Gay, supra,* 42 Cal.4th at pp. 1218–1220). "The 'circumstances of the crime' as used in section 190.3, factor (a), 'does not mean merely the immediate temporal and spatial circumstances of the crime. Rather it extends to "[t]hat which surrounds materially, morally, or logically" the crime.' " (*People v. Blair* (2005) 36 Cal.4th 686, 749 [31 Cal.Rptr.3d 485, 115 P.3d 1145].)

A defendant, however, has no right to introduce evidence not otherwise admissible at the penalty phase for the purpose of creating a doubt as to his or her guilt. (See *People v. Blair, supra,* 36 Cal.4th at p. 750; *People v. Gay, supra,* 42 Cal.4th at p. 1220.) " 'The test for admissibility is not whether the evidence tends to prove the defendant did not commit the crime, but, whether it relates to the circumstances of the crime or the aggravating or mitigating circumstances.' [Citation.]" (*Id.* at p. 1223.) The evidence must not be unreliable (*People v. Blair, supra,* 36 Cal.4th at p. 750), incompetent, irrelevant, lack probative value, or solely attack the legality of the prior adjudication (*People v. Terry* (1964) 61 Cal.2d 137, 144, 145, fn. 5 [37 Cal.Rptr. 605, 390 P.2d 381]; *People v. Gay, supra,* 42 Cal.4th at p. 1219). Error in admitting or excluding evidence at the penalty phase of a capital trial is reversible if there is "a reasonable possibility it affected the verdict." (*People v. Lancaster* (2007) 41 Cal.4th 50, 94 [58 Cal.Rptr.3d 608, 158 P.3d 157]; see *People v. Guerra* (2006) 37 Cal.4th 1067, 1144–1145 [40 Cal.Rptr.3d 118, 129 P.3d 321].)

### 1. Testimony of Joseph Orantes

Defendant first asserts the trial court erred in excluding the opinion of Criminalist Joseph Orantes that the fact the killer dismembered or otherwise disfigured the victim would tend to suggest that he sought to hide the victim's identity, which in turn would tend to suggest that he knew the victim. Orantes would have testified that, sometime "in the early 1980's," during a crime laboratory directors association meeting at FBI headquarters in Quantico, Virginia, he attended a four-hour presentation on the "elements of criminal profiling" in which he learned that the presenters from the FBI had observed in "a number of cases" that when a victim is disfigured, it "tends to suggest that the killer knows the victim." He also would have testified to his involvement in the investigation of two cases in which the killer disfigured the victim and knew the victim, and one case in which the police suspected, but could not firmly establish, such a connection. He acknowledged, however, that the information he received in the FBI course was anecdotal, lacked any statistical foundation, was not included in any published data and was intended for use only as an investigative tool, and that he could not remember the names or any details of the cases in which he was involved.

 The trial court correctly found the proffered testimony, based on imprecise facts and limited experience, lacked an adequate foundation for an expert opinion (see Evid. Code, § 801 [expert opinion limited to special knowledge, skill, experience, training, education of a type reasonably relied on]), and was insufficiently probative on the issue of defendant's guilt. Even if the court abused its discretion, however, defendant has not established a reasonable possibility that the error affected the verdict. (*People v. Lancaster, supra*, 41 Cal.4th at p. 94.) Defendant's conclusion, that the dismemberment of the body had a tendency to prove the killer was someone other than defendant, was speculative at best.

### 2. *Testimony of Dr. Lipson*

Defendant's second argument is the court erred in limiting the testimony of Dr. Lipson, a clinical and forensic psychologist who would have testified he consulted with defendant and suggested that the police should have conducted more investigation into Terry Buchanan as a possible suspect. At a hearing in limine, Dr. Lipson testified that Terry Buchanan had a juvenile record, a Navy record that reflected "some events related to alcohol abuse," and a police record from Las Cruces, New Mexico, related to a "documented event of domestic violence" involving his second wife. He also testified that police reports revealed Terry told his mother he had a recurring dream in which Fran was being tortured with a knife to her throat.

The trial court ruled the proffered evidence had little probative value and was not admissible as evidence of third party culpability.

Defendant now argues the trial court erred, in that he offered Dr. Lipson's testimony not simply to establish Terry Buchanan's possible guilt, but to raise a lingering doubt by showing that the unusual circumstances of this crime made it unlikely that defendant was the killer and that the police conducted an inadequate investigation in focusing solely on defendant.

 We disagree. " ' "Relevant evidence is defined in Evidence Code section 210 as evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' The test of relevance is whether the evidence tends ' "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive. [Citations.]' [Citation.] The trial court has broad discretion in determining the relevance of evidence [citations] but lacks discretion to admit irrelevant evidence. [Citations.]" ' " (*People v. Carter* (2005) 36 Cal.4th 1114, 1166–1167 [32 Cal.Rptr.3d 759, 117 P.3d 476].)

 The trial court correctly concluded that none of the proffered evidence would have been relevant to defendant's efforts to raise a lingering

doubt as to his guilt. Contrary to defendant's argument, the proffered evidence would not have established that Terry Buchanan was a viable third party suspect. "[T]he standard for admitting evidence of third party culpability [is] the same as for other exculpatory evidence: the evidence [has] to be relevant under Evidence Code section 350, and its probative value [cannot] be 'substantially outweighed by the risk of undue delay, prejudice, or confusion' under Evidence Code section 352." (*People v. Kaurish* (1990) 52 Cal.3d 648, 685 [276 Cal.Rptr. 788, 802 P.2d 278], citing *People v. Hall* (1986) 41 Cal.3d 826, 833 [226 Cal.Rptr. 112, 718 P.2d 99].) "To be admissible, the third-party evidence need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt. At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability. . . . [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*People v. Hall, supra,* 41 Cal.3d at p. 833.) The proffered evidence regarding Terry Buchanan did nothing to connect him to the crime in any manner. It therefore was inadmissible as evidence of third party culpability and irrelevant to the issue of lingering doubt.

Further, the proffered evidence would not have established that good reason existed for the police to suspect someone other than defendant. Contrary to defendant's assertions, the circumstances of the crime point to no one other than defendant as the killer of Eleanore Buchanan. Defendant admitted he stole her van near the place and time her classmates last saw her alive. Sheriff's deputies found her blood on his shoe inside the van. The route defendant drove from San Diego to Terrell, Texas, passed near the site where Harry Piper, the target shooter, discovered her dismembered body. Defendant claimed he never saw Eleanore Buchanan, alive or dead, yet in early interviews with the police, he accurately described the clothing she wore the night of her murder. None of the proffered evidence from Dr. Lipson challenged any of the evidence against defendant or otherwise raised a lingering doubt by suggesting that someone other than he was responsible for the murder.

### 3. *Evidence Regarding Continuing Investigation*

Finally, defendant argues the trial court erred in refusing, under Evidence Code section 352, to allow evidence that in 1988 and 1989, years after his 1981 conviction, the district attorney's office conducted investigations into allegations that Jessie Moffett, a defendant in another murder case, bragged to others that he took part in the murder of Eleanore Buchanan. Again, we find no error.

Before the penalty retrial, defendant learned that in 1988, detectives of the San Diego Police Department interrogated one Rory Keller regarding a series of residential robberies. During the interrogation, Keller told Detective Bordine that her boyfriend, Jessie Moffett, confessed to her that in 1979 he was involved in several murders, including the "one that Bernard Hamilton got blamed for."[15] Keller also told Bordine that her mother, Geraldine Elmore, told her that a Clarence Horn told her defendant was at his house at the time of Eleanore Buchanan's murder and therefore could not have participated in the murder. Investigators interviewed Geraldine Elmore in 1989.[16]

Defendant now argues the court erred in not allowing him to support his defense of lingering doubt by establishing, through the testimony of the investigators, the fact that investigation continued into the murder of Eleanore Buchanan years after defendant's conviction for the crime.

The trial court did not err. The record reveals the investigators concluded the only evidence that might have implicated Jessie Moffett in the murder of Eleanore Buchanan was "this one kind of wild hair statement of Rory Keller."

---

[15] The police report reveals the following colloquy:

"[Bordine]: This other case you were telling me about?

"[Keller]: The one Bernard Hamilton got blamed for? Were the arms and legs cut off the girl? *He said he was involved in that one, too.*

"[Bordine]: Did he say how he was involved in that?

"[Keller]: *He said, he helped kill the girl or whatever. The girl wouldn't give up some money or something like that and they were getting pissed off at her because she knew some dope spots or something like that. And he was getting angry with her so they got mad and they cut off her arms and legs, or something like that. That's what he mentioned.* He was telling Michael and Terry. It's like I wasn't even in the conversation.

"[Bordine]: When was this?

"[Keller]: It was in, I believe, the same day, in room 72 on Pacific Highway at the Budget Inn, after the security officer was killed.

"[Bordine]: Was he under the influence again?

"[Keller]: No, he was pretty straight.

"[Bordine]: Did he say that he took part in cutting her arms and legs off?

"[Keller]: *That he said, that she wouldn't give up no information on some money and some dope. So, him and somebody else killed 'em, but he never mentioned the other person's name.*

"[Bordine]: He never mentioned Bernard Hamilton?

"[Keller]: No." (Italics added.)

[16] The police report regarding the 1989 interview with Geraldine Elmore indicates Elmore told investigators she was addicted to crystal methamphetamine and that she met Jessie Moffett in 1987. The report quoted Elmore as saying, *"Bernard Hamilton didn't commit that murder they got him for. Jessie Moffett committed that murder because my daughter Rory told me that Moffett said that he did it. [¶] Years ago, Clarence Horn . . . told me that Bernard Hamilton was drinking with him on the night that lady was murdered. They were drinking in the apartments in the 220 block of Ulric Street where I used to live. [¶] Is all Hamilton did, was probably just find the van and drive it around and he got caught, but I don't think he did that case."* (Italics added.)

The court did not abuse its discretion in concluding this evidence bore little probative value to the defense of lingering doubt and thus properly excluded it under Evidence Code section 352.

## C. *Evidence of Investigating Officer's Interview with Defendant*

In Oklahoma on June 9, 1979, shortly after defendant's arrest, Detective Norman Crawford of the San Diego County Sheriff's Department interviewed defendant. After defendant twice indicated he was "ready to deal with it," Detective Crawford told him, "I don't know what it is, but like I say, you know, a person is, uh, is sick they're going to lay it right out and tell me what happened because they were sick. . . . The person that plays it cool, the cold con, that's going to indicate to me that this thing is premeditated. . . . Set up and that the person could care less about the person that was killed."[17]

---

[17] The relevant portion of the interview is as follows:

"Detective Crawford: Are you into religion now?

"Defendant: I'm into religion of myself. I believe in me.

"Detective Crawford: Uh-huh. You believe in me and the hell with everybody else?

"Defendant: I believe in me. And I'm part of everybody else too.

"Detective Crawford: In what way are you a part of everybody else?

"Defendant: By being a human being.

"Detective Crawford: Uh-huh.

"Defendant: I care about life just as much as other, the next person, you know.

"Detective Crawford: You care about life.

"Defendant: Yeah. Care about the next person just as much as they care about me. If they don't give a damn about me, fuck them too. I ain't involved in this bullshit you're talking about. I'm . . .

"Detective Crawford: Yes, you are.

"Defendant: I'm ready to deal with it.

"Detective Crawford: Yeah, I think you been trying to deal with it.

"Defendant: Uh-huh.

"Detective Crawford: For about a week.

"Defendant: I'm ready to deal with it.

"Detective Crawford: Yeah. I think you just wandered a little too long before you got picked up.

"Defendant: I know what I done and haven't done.

"Detective Crawford: Yeah, uh-huh. You're down there searching. You're searching for something.

"Defendant: (Inaudible)

"Detective Crawford: I don't know what it is, but like I say, you know, a person is, uh, is sick they're going to lay it right out and tell me what happened because they were sick.

"Defendant: Uh-huh.

"Detective Crawford: The person that plays it cool, the cold con, that's going to indicate to me that this thing is premeditated.

"Defendant: Uh-huh.

"Detective Crawford: Set up and that the person could care less about the person that was killed.

"Defendant: Uh-huh.

"Detective Crawford: That's what I'm trying to understand.

At the penalty retrial, counsel sought to have these statements redacted from the tape and transcript of the interview offered into evidence, arguing that Crawford's statements were legal conclusions and opinions that allowed the jury to improperly conclude that a defendant's silence in response to police questioning is evidence of premeditation. The court denied defendant's request under Evidence Code section 352.

Defendant now argues the court erred in admitting the statements in full. He first asserts that Crawford's statements constituted the improper opinion of a lay witness, but his failure to object on this ground at trial forfeited the claim for appeal. He also argues Crawford's statements improperly allowed the jury to "ascribe greater culpability simply because [defendant] maintained his innocence," thereby violating his federal and state constitutional rights to due process and a reliable determination of penalty.

We disagree.

The state standard of review for error at the penalty phase, which is a more "exacting standard" than that employed for state law errors at the guilt phase, is set forth in *People v. Brown* (1988) 46 Cal.3d 432, 447–448 [250 Cal.Rptr. 604, 758 P.2d 1135]: "[W]hen faced with penalty phase error not amounting to a federal constitutional violation, we will affirm the judgment unless we conclude there is a reasonable (i.e., realistic) possibility that the jury would have rendered a different verdict had the error or errors not occurred." (*Id.* at p. 448.) "When evidence has been erroneously received at the penalty phase, this court should reverse the death sentence if it is 'the sort of evidence that is likely to have a significant impact on the jury's evaluation of whether defendant should live or die.' [Citation.]" (*People v. Danielson* (1992) 3 Cal.4th 691, 738 [13 Cal.Rptr.2d 1, 838 P.2d 729].) The federal standard of review for constitutional error is set forth in *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]: "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." We recently reiterated that " ' "*Brown*'s 'reasonable possibility' standard and *Chapman*'s 'reasonable doubt' test . . . are the same in substance and effect." ' " (*People v. Prince* (2007) 40 Cal.4th 1179, 1299 [57 Cal.Rptr.3d 543, 156 P.3d 1015].)

Error, if any, in allowing the penalty retrial jury to hear Crawford's opinion was not prejudicial. Crawford's statements, suggesting the possibility that the murder was the act of a sick mind rather than that of a cold killer, apparently were made in an effort to create an atmosphere in which defendant could

---

"Defendant: Uh-huh. You trying to tell me I'm some kind of nut that's going around setting up people?

"Detective Crawford: I'm not trying to tell you anything."

more easily admit complicity in the murder. Defendant's lingering doubt defense centered around his claim that he did not commit the murder, not his state of mind at the time of the killing. Defendant fails, therefore, to show a reasonable possibility that, had Crawford's opinions of how a killer reveals his state of mind during an interview not been presented to the jury, he would have received a more favorable penalty verdict.

### D. *Evidence of Defendant's Confession Offered at First Trial*

At defendant's first trial, Steven Thomas testified that on January 24, 1980, he had a conversation with defendant about defendant's case when they were both inmates at the San Diego County Jail. As recited in *Hamilton I*, "He asked defendant, 'Who are you trying to convince, Hamilton, me or yourself?' Defendant replied, 'Well, I did it but they'll never prove it.' " (*Hamilton I, supra*, 41 Cal.3d at p. 416.) During cross-examination, the jury in the first trial learned Thomas had been convicted of murder, robbery, forgery, burglary and escape, and was in the federal witness protection program against organized crime, but had not received any money under that program. (*Ibid.*)

The prosecution read to the jury defendant's testimony at the first trial, including defendant's denial of making a confession to Thomas:

" 'Counsel: Did you have a conversation with Mr. Thomas about this case?

" 'Defendant: Not about this case, no. [¶] . . . [¶]

" 'Counsel: Did you hear Mr. Thomas testify that you told him that you did this murder but that they'd never prove it, or words to that effect?

" 'Defendant: Yeah, I heard him.

" 'Counsel: Is that true, did you tell him that?

" 'Defendant: No, I didn't tell him like that.

" 'Counsel: Did you have any conversation about this case at all with Mr. Thomas?

" 'Defendant: No I didn't. Wouldn't have.

" 'Counsel: Did he talk to you about this case at all?

" 'Defendant: No. He made comment [*sic*] that he had either overheard the deputies or he had heard about me in the newspaper or something. The newspaper was being brought in the cell every day to him.' "

Thomas did not testify at the penalty retrial, and the jury heard none of his testimony from the first trial.

After the entirety of defendant's testimony from the first trial was read to the jury without objection, the court expressed concern that, in hearing evidence of defendant's denial that he had confessed to Thomas, the penalty retrial jury inferentially learned of Thomas's testimony asserting defendant had confessed to the murder. The jury never heard any other evidence about the context of the alleged confession or Thomas's cross-examination. Both the prosecutor and defense counsel agreed that the above quoted portion of defendant's testimony should not have been read to the jury and could have been edited out, but could not agree to a remedy. The prosecutor and the court suggested it would be best not to draw further attention to Thomas's statement. The prosecutor stated he never intended to call Thomas as a witness in the penalty retrial and would "just pass over it" in his argument, in part because he had learned from the defense after the first trial that Thomas "had some mental problems of some sort," and in part because it would be difficult to find a federally protected witness. The court suggested "the cure might be worse than the problem" and "to mention it might be worse than just to let it go at this point."

Defense counsel disagreed, arguing that "the bell had been rung" and evidence of an alleged confession was before the penalty retrial jury. He sought to impeach Thomas's credibility with unspecified evidence that Thomas suffered from a mental problem. The court denied the request under Evidence Code section 352, ruling that any probative value of the proffered evidence would be outweighed by the efforts involved in trying to impeach a witness who was not before the jury in the penalty retrial.

Defendant now argues that even though Thomas did not appear in person at the penalty retrial, his allegations that defendant confessed to the murder of Eleanore Buchanan were before the jury, and, because evidence of a confession would severely undermine his lingering doubt defense, the court denied him due process in not allowing him to impeach Thomas's credibility. We disagree.

■ In order to impeach Thomas's credibility, the evidence would have to establish Thomas suffered from a mental illness that, at the time of the first trial, affected his capacity to perceive, recollect, or communicate. (See Evid. Code, §§ 210, 780.) The record reveals the proffered evidence was an

undefined "report" that defendant asserted showed "Mr. Thomas was found to be . . . literally crazy at some point." Standing alone, this is insufficient to call into question Thomas's credibility at the time of trial, and the trial court did not abuse its discretion in excluding it.

 Defendant further argues the prosecutor engaged in misconduct in allowing Thomas's testimony to be read even though he knew he would not be calling Thomas as a witness in the penalty retrial. Defendant did not object on these grounds at trial and therefore failed to preserve this claim for appeal. (*People v. Lewis* (2008) 43 Cal.4th 415, 503 [75 Cal.Rptr.3d 588, 181 P.3d 947].) In any event, this claim has no merit. "A prosecutor's conduct violates a defendant's constitutional rights when the behavior comprises a pattern of conduct so egregious that it infects ' "the trial with unfairness as to make the resulting conviction a denial of due process." [Citation.]' (*Darden v. Wainwright* (1986) 477 U.S. 168, 181 [91 L.Ed.2d 144, 106 S.Ct. 2464].) The focus of the inquiry is on the effect of the prosecutor's action on the defendant, not on the intent or bad faith of the prosecutor. (*People v. Crew* (2003) 31 Cal.4th 822, 839 [3 Cal.Rptr.3d 733, 74 P.3d 820].) Conduct that does not render a trial fundamentally unfair is error under state law only when it involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " [Citation.]' " (*People v. Mendoza* (2007) 42 Cal.4th 686, 700 [68 Cal.Rptr.3d 274, 171 P.3d 2].) The prosecutor acknowledged he should have edited out this portion of defendant's testimony and agreed with the court that the best remedy was to make no further mention of it. In light of the fact that the prosecutor did not refer to Steven Thomas or defendant's alleged confession in his closing argument or at any other time during trial, and did not rely on the alleged confession when he urged the jury to vote for the death penalty, we cannot see that the prosecutor's failure to redact that portion of defendant's prior trial testimony infected the retrial with unfairness or constituted deceptive or reprehensible methods of persuasion.

E. *Evidence of Harassment by Defendant's Investigator*

Beverly Manning testified for the prosecution that when she was 16 years old and living in Shreveport, Louisiana, she met defendant through her cousins, Jerre Brown and Kenneth Dotson. Defendant took her on a trip to California, where she participated in the assault and robbery of Ruth Story. When she said to defendant, "you could have killed this lady for $5.00," he answered that he did not care and just wanted money. Manning told the jury that defendant had a bad temper, that "anytime I rebelled against him he wanted to dominate me," and that defendant struck her, pulled a gun on her, and put a knife to her throat.

Defendant asked Manning during cross-examination whether she recalled a contact with a defense investigator. Manning volunteered that the investigator was "[h]arassing" her.

On redirect examination, over defendant's objection, the prosecution asked Manning if she had some concern about defense investigators learning where she lived, and whether she felt harassed by the defense investigators during the trial. Manning answered, "His investigator. I mean, yeah, by his investigator."

Defendant now argues that whether or not Manning felt harassed was irrelevant and the prosecution's questions suggested without foundation that defendant had attempted to threaten Manning.

The trial court did not err in allowing the prosecution to ask these questions of Manning on redirect examination. " 'It is well settled that when a witness is questioned on cross-examination as to matters relevant to the subject of the direct examination but not elicited on that examination, he [or she] may be examined on redirect as to such new matter.' " (*People v. Steele* (2002) 27 Cal.4th 1230, 1247–1248 [120 Cal.Rptr.2d 432, 47 P.3d 225].) " 'The extent of the redirect examination of a witness is largely within the discretion of the trial court.' " (*Id.* at p. 1247.) Where, as here, one side presents evidence on a point, then tries to prevent the other side from responding, trial courts "should strive to prevent unfairness to either side." (*Id.* at p. 1248.)

Defendant acknowledges that Manning "opened the door" to the subject of harassment by defense investigators during her cross-examination, but nonetheless argues the subject was irrelevant and immaterial because Manning's state of mind at the time of her interview with the defense investigator was not at issue. He argues the trial court should not have allowed the prosecution to capitalize on defendant's error by eliciting further irrelevant evidence on redirect examination.

We disagree. Manning's perception that the defense investigator harassed her is a factor that reasonably might have affected her willingness to cooperate with the defense investigation and thus her credibility. The inquiry was relevant on either direct or cross-examination. Further, any error in allowing the inquiry was nonprejudicial. Exploring the extent of the harassment Manning felt the defense investigator inflicted might, in fact, have benefited defendant.

F. *Evidence Regarding Effectiveness of Representation Rendered by Former Trial Counsel*

Thomas Ryan, the attorney who represented defendant in the first trial, testified for the prosecution that defendant assaulted him in the San Diego

County Jail. Ryan told the jury that he arrived at the jail's visiting room for a pretrial visit and sat down on a small stool. Defendant entered the room, approached Ryan and began to hand him a set of papers. Ryan remained seated, but before he could take the papers, defendant struck him in the jaw with what Ryan described as a "very hard blow," a "sucker punch," which knocked Ryan to the floor. Defendant said nothing. Before Ryan could stand, defendant left the room.

On cross-examination, Ryan acknowledged generally that he and defendant had had numerous differences of opinion about trial tactics and strategy, that defendant thought he was not working with his best interests in mind, and had expressed a high level of skepticism toward attorneys in general. The prosecution objected to defendant's efforts to ask questions regarding specific incidents in which defendant and Ryan disagreed.

In a hearing outside the presence of the jury, defendant indicated he wanted to establish that Ryan had rendered ineffective assistance in the first trial. Such evidence, he argued, was relevant to rebut the prosecution's evidence in aggravation by establishing objective support for defendant's frustration with Ryan, and relevant to the defense of lingering doubt in that it would help convince the jury the conviction was the result of inadequate representation. To that end he sought to ask Ryan about the specific instances of disagreement, and to offer the expert opinions of two criminal defense attorneys regarding the quality and adequacy of Ryan's representation in the first trial.

The court refused to permit testimony regarding the effectiveness of Ryan's representation, ruling that ineffective assistance of counsel was not an issue for the jury to decide and was not relevant to rebut the prosecution's evidence in aggravation or support the defense of lingering doubt. The court limited defendant's cross-examination of Ryan, refused to allow questions about the details of a number of specific disagreements, and refused to allow defense experts to testify to their opinion of the quality of Ryan's representation.

Defendant now argues that by refusing to permit evidence of ineffective assistance of counsel, the trial court violated his state and federal constitutional rights to due process, to present a defense, and to a reliable penalty verdict. We find no error.

" 'The Eighth and Fourteenth Amendments require the jury in a capital case to hear any relevant mitigating evidence that the defendant offers, including " 'any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.' " ' " (*People v. Harris* (2005) 37 Cal.4th 310, 352–353 [33 Cal.Rptr.3d 509, 118 P.3d 545].) The court, however, has the

authority to exclude as irrelevant evidence that does not bear on the defendant's character, record, or the circumstances of the offense. (*Ibid.*) "The trial court determines relevancy of mitigating evidence and retains discretion to exclude evidence whose probative value is substantially outweighed by the probability that its admission will create substantial danger of confusing the issues or misleading the jury." (*People v. Guerra, supra,* 37 Cal.4th at p. 1145.)

 We see no abuse of discretion. The determination of whether a defendant received ineffective assistance of counsel is a legal one made by a reviewing court, not a factual one entrusted to a finder of fact. (See *In re Scott* (2003) 29 Cal.4th 783, 822 [129 Cal.Rptr.2d 605, 61 P.3d 402].) It has no bearing on a defendant's character, prior record, or the circumstances of the offense, and therefore is not admissible as evidence in mitigation. (See *People v. Zapien* (1993) 4 Cal.4th 929, 989 [17 Cal.Rptr.2d 122, 846 P.2d 704].)

### G. *Victim Impact Evidence*

The prosecution presented several witnesses who testified to the impact of Eleanore Buchanan's murder on her family, particularly on her husband Terry Buchanan, who died of coronary heart disease in 1994 before the penalty retrial. Defendant argues the court erred in admitting this evidence and thereby violated his federal and state rights to due process, to a reliable penalty verdict, and to be free from cruel and unusual punishment. We see no error.

### 1. *Prosecution's Evidence*

Dorothy Lininger, Eleanore's mother, testified to the following: Eleanore was on several sports teams and the drill team in high school, made her own clothes, had an active social life, and liked to go camping and to church. In 1973, before she met Terry, Eleanore married her high school boyfriend but the marriage ended in an annulment. Over the objection of her parents, Eleanore joined the Navy when she was 19; she was independent and adventurous, and matured during her time in the service. She met and married Terry Buchanan while they were both in the Navy. Eleanore and Terry divorced shortly after they were married in 1975; Mrs. Lininger attributed this to Eleanore's unwillingness to tolerate Terry's drinking. Mrs. Lininger testified that when Terry and Eleanore agreed to remarry in 1976, Terry promised to, and did, quit drinking. Eleanore left the Navy when she got pregnant with Jason. Mrs. Lininger testified Eleanore was eager to improve herself by going to college.

Mrs. Lininger testified to the heartbreak she witnessed at a family reunion after the murder: Joseph, at age four, became very upset when he realized that

his cousins had mothers and he did not, and Terry found it difficult to be around Eleanore's sisters because of their close physical resemblance to Eleanore. After that reunion, Terry never came to another. Further, since the murder, Eleanore's sister Judy was devastated and anxious, and required counseling to stop her fears from destroying her life and her relationship with her children. Mrs. Lininger herself was very fearful since the murder, would not go out at night alone, would lock the doors and windows even on a nice evening, and was very leery in public.

Eileen Banker, Eleanore Buchanan's grandmother, spoke of Eleanore's joy at becoming a mother in 1978 and again in 1979, and of the family gathering held on May 28, 1979, two days before the murder, where Eleanore's and Terry's families met the new baby. She told the jury that when Eleanore was young she "was feisty and played tricks, and she was clever and cute and argumentative and—when she wanted to open all her Christmas gifts early, we asked her why, and she said, 'so you can see my happy, smiling face.'"

Netty Fisher, Terry's mother, testified that Terry was devastated in the months after the murder. He would stare silently into space with his baseball cap pulled down over his eyes, and would often cry. He had trouble sleeping and had nightmares about Eleanore. He chewed holes in his tongue and ground his teeth. When Jason and Joseph were in their teens they came back to live with her because Terry was unemployed and could not take care of them.

Barbara Busch, a neighbor of the Buchanans' at the time of the murder, testified that in the days and weeks after the murder, Terry Buchanan needed emotional and moral support and was unable to care for the two small children by himself.

William Conover testified he met Terry in the Navy after Terry and Eleanore divorced but before they remarried. Terry was a fun-loving friend while in the Navy, who liked to go out for drinks and a good time, and after marriage to Eleanore, Conover knew Terry to be a proud father and loving husband. Immediately after the murder, Terry was reclusive, distraught, dejected and "very down." Conover saw Terry several years later, and believed that Terry never got over the murder of his wife.

Jason Buchanan, Eleanore and Terry Buchanan's eldest son, who was 14 months old at the time of the murder and 17 years old at the time of the penalty retrial, testified that for five years after his mother's murder his father was unable to care for him and his brother during the day so they lived with his father's parents in Las Cruces, New Mexico, and his father lived nearby in his own apartment. His father would come by in the evenings and on

weekends. Eventually, he and his brother moved with their father to Phoenix, Arizona, where they lived until shortly before their father's death in 1994.

Jason told the jury that his father was ill near the end of his life and unable to work. He testified that his father encouraged him and his brother to become active in sports, and he served as assistant coach to their baseball teams. He had no memory of his mother, but his father told them about her and talked about her a lot: "He always told us how much he loved her and how he still wishes she was around, and how things would be better if she was." Jason stated that on the day before his father's death, his father had been feeling bad and had pains in his chest, but refused his sons' efforts to get him to go to the doctor. That evening, his father "told us how much he loved our mom," and "how much he loved us." Defendant made no objection at the time the prosecution offered this testimony.

Joseph Buchanan, Terry and Eleanore's youngest son, who was an infant at the time of his mother's murder and 16 years old at the time of the penalty retrial, testified that his father developed a drinking problem near the end of his life and spent time in bars. On the night before his death, "he told me and [Jason] both that he loved us a lot, that he loved our mom. And he told us that if anything happened to him that he wanted us to call first his friends . . . and then my grandma, and then he wanted us to call the police." Joseph told the jurors that he thought his father knew he would die soon when he said that. Joseph told how the next day, after returning home from school, he went into his father's bedroom "to make sure he was all right" and found his father dead on the bed. Defendant made no objection at the time the prosecution offered this testimony.

Frank Sexton, who prosecuted defendant for the robbery of Ruth Story in San Diego in 1978 and the capital crime in 1979, testified he kept in contact with Terry Buchanan in the years following the capital trial up to Terry's death in 1994. Over defendant's objection on grounds of relevance and lack of foundation, Sexton testified to his opinion that the murder took an emotional toll on Terry Buchanan, who "was heartbroken and overwhelmed. He had to take care of two little kids by himself. And he was totally devastated. And I don't think he ever got over it. It haunted him for the rest of his life, and it was finally the end of him."

### 2. *Retroactive Application of* Payne v. Tennessee

At the time of defendant's first trial in 1981, federal and state law prohibited the introduction of victim impact evidence. (*Booth v. Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529] [reversible error to admit victim impact evidence in 1983 trial]; *People v. Gordon* (1990) 50

Cal.3d 1223, 1266 [270 Cal.Rptr. 451, 792 P.2d 251] [victim impact evidence inadmissible in 1983 trial].) Before the commencement of the penalty retrial in 1995, the United States Supreme Court partially overruled *Booth v. Maryland, supra,* 482 U.S. 496, and held that the Eighth Amendment does not per se bar the admission of victim impact evidence if the state chooses to permit such evidence. (*Payne v. Tennessee* (1991) 501 U.S. 808, 827 [115 L.Ed.2d 720, 111 S.Ct. 2597].) We thereafter overruled *People v. Gordon, supra,* 50 Cal.3d at page 1266, and concluded that victim impact evidence is admissible in aggravation under section 190.3, factor (a), as a circumstance of the crime of which defendant was convicted. (*People v. Edwards* (1991) 54 Cal.3d 787, 835 [1 Cal.Rptr.2d 696, 819 P.2d 436].) Defendant first renews the argument he made in a motion during the penalty retrial that *Payne v. Tennessee* and *People v. Edwards* should not be applied retroactively and the admission of any victim impact evidence constituted error. We rejected this argument in *People v. Clair* (1992) 2 Cal.4th 629, 672 [7 Cal.Rptr.2d 564, 828 P.2d 705], and see no reason to reconsider our decision.

Defendant also argues that the retroactive application of *Payne v. Tennessee* and *People v. Edwards* at the penalty retrial would violate the ex post facto and due process guarantees of the state and federal Constitutions. Because defendant failed to object at the penalty retrial to the introduction of evidence on these grounds, however, he failed to preserve this claim for appeal. (Evid. Code, § 353; see, e.g., *People v. Benavides* (2005) 35 Cal.4th 69, 92 [24 Cal.Rptr.3d 507, 105 P.3d 1099]; *People v. Champion* (1995) 9 Cal.4th 879, 918–919 [39 Cal.Rptr.2d 547, 891 P.2d 93].) In any event, we have rejected this contention. (*People v. Brown* (2004) 33 Cal.4th 382, 394 [15 Cal.Rptr.3d 624, 93 P.3d 244].)

### 3. *Evidence of Terry Buchanan's Life and Death*

Defendant next renews his objection that the evidence regarding Terry Buchanan's continued depression and suffering for over 16 years from the time of the murder, the details of his use of alcohol near the end of his life, and the circumstances of his death as related by his sons exceeded the scope of permissible victim impact evidence and was irrelevant to the circumstances of the crime under section 190.3, factor (a). Not so. The "circumstances" of the crime under section 190.3, factor (a) are not merely the immediate temporal and spatial circumstances of the crime, but extend to that which surrounds the crime materially, morally, or logically. (*People v. Edwards, supra,* 54 Cal.3d at p. 835.) Defendant urges us to restrict victim impact evidence to the "immediate injurious impact" of the murder, and argues that evidence of Terry Buchanan's state of mind at the time of his own death is irrelevant to the circumstances of the capital offense. We rejected a similar argument in *People v. Brown, supra,* 33 Cal.4th at page 397, in which

we held it was logical to conclude that the psychological and physical effects of a violent murderous assault more than 20 years earlier would endure, and were relevant as direct results of the defendant's crimes. The same reasoning applies here.

Further, the rationale behind allowing victim impact evidence is that " '[t]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.' " (*Payne v. Tennessee, supra,* 501 U.S. at p. 825.) The federal Constitution bars victim impact evidence only if it is "so unduly prejudicial" as to render the trial "fundamentally unfair." (501 U.S. at p. 825.) State law under section 190.3, factor (a) bars victim impact evidence if it " 'diverts the jury's attention from its proper role or invites an irrational, purely subjective response.' " (*People v. Edwards, supra,* 54 Cal.3d at p. 836.)

Defendant was entitled to, and did, present in mitigation evidence regarding productive aspects of his life in the years of his incarceration for the capital crime up to the time of the penalty retrial. He presented numerous witnesses who testified to the positive aspects of the artwork defendant created during his incarceration for the capital crime and the positive responses the artwork generated in the statewide and national communities committed to the abolition of the death penalty.

Evidence that the Buchanan family continued to suffer the effects of the capital crime up to and during the penalty retrial was relevant to " 'remind[] the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.' " (*Payne v. Tennessee, supra,* 501 U.S. at p. 825.) Nothing in the testimony of any of the prosecution's witnesses who testified to the Buchanans' sufferings was unduly inflammatory or prejudicial, nor did it invite an irrational or purely emotional response from the jurors. Rather, the evidence was short, not overly sentimental, melodramatic or emotional, and not unexpected from the sons, parents, and in-laws of a young woman brutally murdered shortly after the birth of her second son. That Terry Buchanan suffered the effects of the crime up to the day of his own death was not unexpected, and testimony to that effect was not prejudicial.

4. *Argument That Terry Buchanan Was a Second Victim of the Murder*

Defendant further renews his trial objection to the prosecutor's statement in closing argument that defendant "not only killed Terry's wife[,]

he took Terry's reason to live. I think Terry Buchanan [was] a murder victim just like Fran [was;] just took him 15 years to die." Defendant argues this statement transformed a single-victim case into a multiple-murder case, asked the jury to look on Terry Buchanan's death as a homicide, and, in effect, charged defendant with culpability for an event that occurred 15 years after the crime. We disagree. A prosecutor engages in misconduct by misstating facts, but enjoys wide latitude in commenting on the evidence, including the reasonable inferences and deductions that can be drawn therefrom. (See *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 95 [17 Cal.Rptr.3d 710, 96 P.3d 30].) The prosecutor's single statement[18] characterizing Terry Buchanan as a "victim" was an appropriate summation of the evidence regarding the effect of the capital crime on the surviving widower. No reasonable juror would conclude that the prosecutor was asking him or her to find defendant legally responsible for the death of Terry Buchanan.

### 5. *Question Withdrawn by Prosecution*

Defendant next renews an argument at the penalty retrial regarding the prosecution's use of the term "anesthetize" to characterize Terry Buchanan's actions near the end of his life. During direct examination of Joseph Buchanan, the prosecutor asked several questions regarding Terry's use of alcohol. He then aborted a question as follows: "Basically trying to anesthetize himself—never mind. Let me go to the night before he died. What did he tell you the night before he died?" Defendant did not object at the time, but when next out of the presence of the jury argued that "the suggestion now is that [Terry] was anesthetizing himself and, by inference, killing himself because of the loss of his wife."

Defendant sought a mistrial on the grounds that the question constituted improper victim impact evidence in that it allowed the prosecution to imply that defendant was responsible for Terry Buchanan's death. The court denied the motion, ruling that the prosecutor withdrew the question and the witness did not answer it.

Defendant now argues the court erred. We disagree. The court instructed the jury, "[i]f a question was put to a witness, but the witness did not answer the question, of course, that produces no evidence for your consideration. . . . [¶] The questions themselves may have suggested the existence of certain facts. And the question may have been [']isn't it a fact such and such[';] if that question wasn't answered, then the question doesn't establish that it is a fact." The court's instruction correctly informed the jury that questions by

---

[18] Defendant also argues the prosecutor erred in commenting that Terry and sons Jason and Joseph Buchanan were "other victims of this case." The prosecutor made this comment, however, out of the jury's presence and therefore it could not have prejudiced defendant.

counsel were not evidence and eliminated the possibility that the jury would improperly consider facts not in evidence.

Defendant further argues the prosecutor engaged in misconduct in asking the question. In light of our determination that the instruction by the court properly eliminated any possibility that the jury would improperly consider facts not in evidence, any misconduct could not have prejudiced defendant.

### 6. *Lay Opinion of Former Prosecutor*

■ Defendant next renews the objection at the penalty retrial to the introduction of the opinion of former prosecutor Frank Sexton. Sexton testified that Terry was heartbroken and overwhelmed at the murder of his wife, that the murder haunted Terry for the rest of his life "and it was finally the end of him." Defendant argues this was not proper lay witness opinion, in that it lacked a proper foundation. We disagree. The opinion of a lay witness is admissible if it is rationally based on the witness's perception. (Evid. Code, § 800, subd. (a).) Sexton told the jury he had kept in contact with Terry "all through the court proceedings [of the capital trial] . . . and . . . in the years following the case and up until his death." The trial court reasonably could infer that in those years of contacts, Sexton observed Terry's mood and demeanor, and that the opinion to which he testified was based thereon. In any event, any such error was harmless, because there was ample other evidence admitted establishing the impact of Eleanore's murder on her husband.

### 7. *Exclusion of Evidence to Rebut Evidence in Aggravation*

Defendant next argues the court improperly refused to allow him to introduce evidence of Terry's subsequent marriage, which ended in divorce after six months, and his records from the Navy reporting alcohol-related incidents. Defendant argued this evidence was necessary to refute the prosecution's implication that it was his grief over the loss of Eleanore that caused him to drink himself to death, and to offer additional explanations for his behavior and depression. The trial court found the proffered evidence to be of limited probative value and excluded it under Evidence Code section 352.

"The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) "Our review on this issue is deferential. A trial court's decision whether to exclude evidence pursuant to Evidence Code section 352 is

reviewed for abuse of discretion. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1118 [74 Cal.Rptr.2d 121, 954 P.2d 384].)" (*People v. Mendoza, supra,* 42 Cal.4th 686, 699.)

We see no abuse of discretion. Defendant argued the proffered evidence would have given the jury a more balanced picture of Terry Buchanan's life and offered other factors that might have contributed to his drinking and depression and untimely death. The trial court reasoned that evidence of Terry's drinking and depression was offered by the prosecution not to establish a causal link between the capital crime and his drinking and death, but to show the murder had a significant impact on him. Defendant's evidence would not have refuted this, would have required "a mini-trial" about the reasons why Terry Buchanan drank, and therefore was of limited probative value and properly excluded under Evidence Code section 352.

Even if the court did err, defendant suffered no prejudice. The proffered evidence would not have altered the general picture of Terry Buchanan given to the jury through testimony of Jason and Joseph, who testified that he spoke of their mother the night before his own death, of William Conover, who testified to Terry's drinking habits before and after Eleanore's murder, and of Eleanore's mother, who explained that Terry and Eleanore's first marriage ended in divorce because of his drinking.

### 8. *Photographs*

Defendant next argues the court erred in admitting three photographs.

■ We review for abuse of discretion rulings by the trial court on the admissibility of evidence, including rulings that turn on the relative probativeness and prejudice of the evidence in question. (*People v. Jablonski* (2006) 37 Cal.4th 774, 805 [38 Cal.Rptr.3d 98, 126 P.3d 938].) " 'Evidence is substantially more prejudicial than probative (see Evid. Code, § 352) if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome" [citation].' . . . 'The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair.' " (*Ibid.,* citation omitted.)

Defendant renews his objection that the first photograph depicting Eleanore, Jason, and Terry Buchanan, was cumulative of others already admitted. The record reveals the prosecution introduced only one other photograph of Eleanore while she was alive, depicting Eleanore with her infant son Joseph. We see no abuse of discretion and no prejudice in the introduction of one additional photograph of Eleanore with her other son and husband.

The second and third contested photographs, respectively, depicted Terry Buchanan and his sons in their baseball and football uniforms. Defendant did not object when the prosecution asked the witness to show these two photographs to the jury; when the prosecutor later moved to admit both photographs into evidence, however, defendant objected, arguing they constituted improper victim impact evidence. The court overruled the objection, but found the introduction of both photographs would have been cumulative, and admitted only the photograph of Terry and his sons clad in football uniforms.

Defendant's argument that the court improperly admitted the photograph has no merit. As the prosecutor argued, the photograph was relevant to show Terry Buchanan's "efforts to provide a home . . . and a happy life" for his sons after the murder of his wife. This is not improper victim impact evidence. The photograph is not overly emotional, sentimental, or otherwise prejudicial, and did not pose a risk to the fairness of the proceedings. The court did not abuse its discretion in admitting the photograph into evidence.

### 9. *Section 190.3, Factor (a) as Unconstitutionally Vague*

Defendant argues that if we interpret section 190.3, factor (a) to allow for such a broad array of victim impact evidence as was presented here, we will render that statute unconstitutionally vague. We rejected this argument in *People v. Pollock* (2004) 32 Cal.4th 1153, 1183 [13 Cal.Rptr.3d 34, 89 P.3d 353], and defendant fails to convince us to reconsider that decision.

### H. *Trial Court Error in Failing to Instruct Sua Sponte Regarding Testimony of Former Prosecutor*

Frank Sexton, a retired deputy district attorney for San Diego County, testified at the penalty retrial. He told the jury he had been retired from the practice of law since 1983, and had been hearing impaired since World War II when the plane in which he was serving as a United States Air Force aerial gunner was shot down.

He told the jury that in 1978 he was assigned to prosecute defendant for the robbery of Ruth Story and, after the preliminary hearing in that case, received two letters defendant had written while in jail: one defendant had sent to Story, who in turn passed it on to Sexton, and one defendant had sent to the District Attorney of San Diego County, who also passed it on to Sexton. Sexton testified that the trial for the Story robbery was scheduled to begin on June 19, 1979, but never took place because defendant was arrested for the capital murder in Oklahoma in early June 1979. Sexton was assigned to prosecute the capital murder, traveled to Marietta, Oklahoma, to investigate the case, and, while at the sheriff's office, saw on the wall a wanted poster for

"Spider," which caught his eye because defendant had been telling stories about how Eleanore Buchanan was still alive and "running around with a guy named Spider." He testified that Terry Buchanan, who testified at the first trial, had died on June 2, 1994; that he had kept in contact with Terry since the first trial and thought that the murder had haunted Terry for the rest of his life. Finally, Sexton testified that in the first trial, defendant admitted to having suffered the prior felony convictions for forgery and burglary in San Diego, and auto theft in Fresno and Louisiana, as was alleged in the information.

Defendant argues the penalty retrial court erred in not instructing the jury, sua sponte, that they were not to give Sexton's testimony special weight simply because he was a prosecutor associated with this case. He argues this failure violated his federal and state constitutional rights to due process, a fair and impartial trial, and a reliable penalty verdict. We disagree.

When a witness is a courtroom officer who testifies to statements defendant made to him during the pendency of the trial and who then resumes his duties in the trial courtroom, the trial court should instruct the jury not to give any artificial weight to the witness simply because he is a courtroom officer. (See *People v. Hill* (1998) 17 Cal.4th 800, 842–843 [72 Cal.Rptr.2d 656, 952 P.2d 673].) Defendant argues such is the case here, relying on *United States v. Torres* (2d Cir. 1974) 503 F.2d 1120, 1126, which found reversible error where, in the absence of a showing that he was the only possible source of this information, the second-chair prosecutor testified to an encounter he witnessed between the defendant and a codefendant, and *United States v. Birdman* (3d Cir. 1979) 602 F.2d 547, which held that where the prosecutor's appearance as a witness was unavoidable, the prosecutor should withdraw from participating in the trial. The danger alluded to in these cases—that the jury would accord greater weight to the testimony of a witness who was an officer of the court and with whom they interacted during trial—was not present in this case. The court commits no error in refusing to instruct when the testifying courtroom officer had no interaction with the jury. (See *People v. Guerra, supra,* 37 Cal.4th at p. 1122 [no error in failing to give such an instruction when a bailiff testified to statements defendant made to him during a pretrial hearing and the bailiff did not serve at defendant's trial and had no interaction with the jury].) Sexton's participation in the prosecution of defendant had ended 12 years before the penalty retrial, and he was presented as a retired, not an active, prosecutor.

Defendant's reliance on *People v. Arends* (1957) 155 Cal.App.2d 496 [318 P.2d 532], serves him no better. There the reviewing court found reversible error where the prosecutor who conducted the preliminary hearing, but not the trial, testified to his " 'considered opinion that the defendant was

guilty.' " (*Id.* at p. 509.) The danger was that the jury would "view the prosecutor's expressed belief in the defendant's guilt as being based on outside sources." (*People v. Lopez* (2008) 42 Cal.4th 960, 971 [71 Cal.Rptr.3d 253, 175 P.3d 4].) Here, in contrast, the majority of Sexton's testimony concerned events to which he was a percipient witness—receipt by the district attorney's office of letters written by defendant; seeing the "Spider wanted poster" in the Marietta, Oklahoma, Sheriff's Department; defendant's admission to various prior convictions; and Terry Buchanan's continued suffering. He gave his opinion not as to defendant's guilt or deserved punishment, but only to Terry Buchanan's state of mind at the time of Terry's death, and made it clear the opinion was based on personal contact with Terry over the intervening years.

Defendant therefore fails to establish that the trial court erred in not, sua sponte, giving cautionary instructions concerning Sexton's testimony.

### I. *Assertedly Insufficient Evidence of Unadjudicated Assault on Sheriff's Deputies*

William Hanson and Johnnie Christiansen, deputies at the San Diego County Jail, each testified to the events of the morning of October 8, 1980, when defendant refused to get out of bed and come to court. When the deputies entered his cell, defendant "rolled over, looked at [the deputies], and then pulled the blanket back up over his head." When Hanson pulled off the blanket, defendant "immediately stood up . . . kind of backed in the corner and faced us and brought his arms and fists in a . . . fighting stance" with his fists doubled up, leading Hanson to believe defendant was about to strike him. Christiansen testified defendant stated, "If you want . . . me to go to court you're going to have to take me to court." The deputies grabbed defendant, forced him out of the cell and up against a wall, and placed waist and leg chains on him. Defendant resisted their efforts to take him out of the cell and "struggled as violently as he could." Christiansen remembered it as "an extraordinary event" and "an instantaneous confrontation." He stated that no fight occurred because "we didn't allow that to occur . . . we gained control of him and moved him out of the cell." Christiansen testified that "there was no question at the time that had we not [grabbed his arms] . . . there would have been a fight that transpired." As the deputies led defendant down the hall, he resisted and spat on Hanson's face.

Defendant sought to exclude any argument or instructions regarding the crime of assault as related to the incident with Deputies Hanson and Christiansen, arguing the evidence presented was insufficient to establish an assault as a factor in aggravation under section 190.3, factor (b), which requires a showing of criminal activity involving the use or attempted use of

force or violence or the express or implied threat to use force or violence. He argued that because he did not throw any punches or otherwise attempt to strike the deputies, his resistance to them was limited to the use of profanity and assuming a fighting stance, neither of which, he argues, was sufficient to constitute an assault. The court determined the evidence was "not the strongest case[] of assault that one could imagine, but I think there's some substantial evidence there based on what a reasonable juror would find" and permitted the prosecutor to argue it to the jury. The court instructed the jurors on the definitions of both assault and battery, and instructed further that no juror could consider such evidence unless first convinced of its truth beyond a reasonable doubt.

Defendant now renews his argument that the evidence was insufficient to establish an assault. He also argues for the first time on appeal that the evidence of battery was only speculative and the court, therefore, erred in admitting any evidence of the event at all. Because defendant did not challenge the sufficiency of the evidence of battery at trial, and did not object to the evidence when it was introduced, he may not do so now for the first time on appeal. (Evid. Code, § 353; *People v. Benavides, supra,* 35 Cal.4th at p. 92.) In any event, we see no error.

The evidence that defendant spat upon Deputy Hanson was sufficient for jurors to find defendant committed a battery, or "any willful and unlawful use of force or violence upon the person of another." (§ 242; see *People v. Pinholster* (1992) 1 Cal.4th 865, 961 [4 Cal.Rptr.2d 765, 824 P.2d 571] [throwing a cup of urine in a person's face is a battery].) The evidence was also sufficient for the jurors to find defendant committed an assault, or "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) Defendant leaped out of bed in a confrontational manner, raised his fists, took a fighting stance, informed the deputies that he would go to court only if they "took him," and struggled violently as the deputies extracted him from the cell, all of which led both deputies to testify that the only reason there had not been an actual "fight" was because they secured defendant's arms before he could strike them. A reasonable interpretation of this evidence would be that in the moments before the deputies could secure him defendant attempted, and had the present ability, to inflict a violent injury on the deputies.

### J. *Threats As Evidence in Aggravation*

Defendant next argues the court improperly instructed the jury regarding threats contained in a letter defendant wrote to Theresa Roch, and threatening words spoken over the telephone to Donna Hatch. He argues the evidence was insufficient to establish that these acts violated any penal statute and

therefore was inadmissible as a factor in aggravation under section 190.3, factor (b). He also argues the evidence should have been excluded under Evidence Code section 352. The error, he argues, violated his federal and state constitutional rights to due process and a reliable penalty verdict.

### 1. *Letter to Theresa Roch*

On July 6, 1979, defendant wrote a letter to Theresa Roch from the San Diego County Jail in which he stated the following: "By the way, today I got news from Quack. He says he knows I am innocent but also knows how I will get railroaded. So if I loose [*sic*] this case, they will take out O'Connor, Sexton, McCarno [*sic*] and Armstrong, or at least one member of their family [*sic*]. I don't like the idea of violence, since I have never been a violent person and the proposal seeks my agreement. I haven't sent an answer as of yet because I have to consider a lot of things before I do. I don't like the idea . . . but I also don't like sitting on someone else's murder charge! So that gives me a lot to think about."

Over defendant's objections, the prosecution introduced the letter as a factor in aggravation, characterizing it as a threat to kill Deputy District Attorneys Frank Sexton and Thomas McArdle, Defense Attorney Patrick O'Connor, San Diego County Sheriff's Department Criminalist, Brandon Armstrong, and members of their families, in violation of sections 69 (deterring an executive officer)[19] and 71 (threat to injure a public officer),[20] and title 18 United States Code section 876 (use of mail to communicate threat).[21]

---

[19] Section 69 provides in pertinent part: "Every person who attempts, by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon such officer by law, . . . is punishable by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment in the state prison, or in a county jail not exceeding one year . . . ."

[20] Section 71 provides in pertinent part: "Every person who, with intent to cause, attempts to cause, or causes, any . . . public officer or employee to do, or refrain from doing, any act in the performance of his duties, by means of a threat, directly communicated to such person, to inflict an unlawful injury upon any person or property, and it reasonably appears to the recipient of the threat that such threat could be carried out, is guilty of a public offense . . . . [¶] . . . [¶] As used in this section, 'directly communicated' includes, but is not limited to, a communication to the recipient of the threat by telephone, telegraph, or letter."

[21] Title 18 United States Code section 876 provides, in pertinent part: "(a) Whoever knowingly deposits in any post office or authorized depository for mail matter, to be sent or delivered by the Postal Service or knowingly causes to be delivered by the Postal Service according to the direction thereon, any communication, with or without a name or designating mark subscribed thereto, addressed to any other person, and containing . . . . [¶] . . . [¶] (c) . . . any threat to kidnap any person or any threat to injure the person of the addressee or of another, shall be fined under this title or imprisoned not more than five years, or both."

Defendant argues the court erred in instructing the jury as to the elements of these three crimes and admitting the letter into evidence as a factor in aggravation. We agree that the prosecution lacked sufficient evidence to prove that defendant violated either Penal Code section 71 or title 18 United States Code section 876, but conclude the evidence was sufficient to find that he violated Penal Code section 69. The letter, therefore, was properly admitted. Any error in instructing the jury regarding section 71 or title 18 United States Code section 876 was harmless.

■■■ Section 69 requires that the defendant attempted, by threat, to deter executive officers from performing their legal duties. The fact that defendant wrote the letter at the start of the capital proceedings against him and in it threatened to kill the prosecutors, Sexton and McArdle, Criminalist Armstrong, his own defense counsel, and their families should he lose at trial is sufficient evidence to find the letter contained threats against executive officers. Further, in spite of the fact that the letter was addressed to Theresa Roch, there is sufficient evidence to find defendant knew the threats would be delivered to the district attorney's office. Defendant was incarcerated at the San Diego County Jail and therefore was unable to deliver the letter directly to the United States Postal Service. He used the only means available to him under those circumstances, and placed the letter into the San Diego County Jail's normal mail circulation routine by giving the letter to a deputy sheriff assigned to process outgoing mail. The deputy sheriff, however, intercepted the letter upon learning that there had been a security "hold" placed on defendant's mail and delivered it instead to the district attorney's office. The record reveals that at the time defendant placed the letter to Theresa Roch with the deputy sheriff, he was aware of the existence of the hold on his mail and knew that the district attorney would read his letters.[22] It can be argued, therefore, that even though defendant placed the letter to Theresa Roch into the jail's outgoing mail by giving it to the deputy sheriff, he knew it would eventually be delivered to the prosecutor's office.

Contrary to defendant's argument, section 69 does not require a showing that McArdle, Armstrong, Sexton or O'Connor took the threats seriously or felt threatened by the letter (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1153 [124 Cal.Rptr.2d 373, 52 P.3d 572]), or that defendant had the present ability to carry out the threats (*People v. Hines* (1997) 15 Cal.4th 997, 1060 [64 Cal.Rptr.2d 594, 938 P.2d 388]). Evidence that the letter contained the threats was sufficient to support a finding that defendant violated section 69.

---

[22] On June 21, 1979, weeks before defendant wrote the letter to Theresa Roch, defendant wrote a letter to Terry Buchanan from the San Diego County Jail in which he stated, "I know the D.A. will get this letter."

 Whether the letter sufficed to prove a violation of title 18 United States Code section 876 is a closer question. That statute requires proof of only two elements for conviction: first, the defendant must have written and mailed a letter or other communication containing a threat to injure another person, and second, he or she must have knowingly caused the letter to be deposited in the mails. (*United States v. Sirhan* (9th Cir. 1974) 504 F.2d 818, 819.) Contrary to defendant's argument, the threat need not be directed to the recipient of the letter. (*Ibid.* [letter addressed to U.S. Secretary of State Rogers contained a threat to kill Israeli Prime Minister Golda Meir].) Nor is it necessary that the victim receive the threat. (*U.S. v. Geisler* (7th Cir. 1998) 143 F.3d 1070, 1072.)

Defendant correctly argues the evidence failed to prove he violated title 18 United States Code section 876 because it did not establish that he caused the letter to be deposited in the mail. As set forth above, even though defendant placed the letter to Theresa Roch into the jail's outgoing mail by giving it to the deputy sheriff, he knew it would be intercepted by the deputy sheriffs and delivered to the district attorney's office. He knew it would not be, and arguably did not intend for it to be, actually deposited into the United States Postal Service, and therefore he did not violate title 18 United States Code section 876.

That the evidence was insufficient to show a violation of section 71 is clear. Section 71 requires a showing that the defendant "with intent to cause, attempts to cause, or causes, any . . . public officer or employee to do, or refrain from doing, any act in the performance of his duties, by means of a threat, directly communicated to such person, to inflict an unlawful injury upon any person or property, and it reasonably appears to the recipient of the threat that such threat could be carried out . . . ." The prosecution presented no evidence that the threats were directly communicated to the four intended victims and no evidence that any of the victims harbored a reasonable belief that the threat could be carried out. In the absence of such evidence, the prosecution failed to establish defendant violated section 71 by writing the letter to Theresa Roch.

Because the letter included threats to use force and violence and violated section 69, the court did not err in admitting it as evidence in aggravation under section 190.3, factor (b). We see no reasonable likelihood that in giving the additional instructions regarding section 71 and title 18 United States Code section 876 the court misled or confused the jury. Although it is error to give an instruction that, while correctly stating a principle of law, has no application to the facts of the case, such an error does not appear to be of federal constitutional dimension. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129–1130 [17 Cal.Rptr.2d 365, 847 P.2d 45].) Further, the court instructed the jurors not

to consider a factor in aggravation unless they first were convinced of its truth beyond a reasonable doubt, and we presume they followed those instructions. (See *People v. Dunkle* (2005) 36 Cal.4th 861, 920 [32 Cal.Rptr.3d 23, 116 P.3d 494].) Even assuming error in the giving of the instructions, in light of the great weight of evidence presented in aggravation we see no reasonable possibility defendant would have obtained a different verdict in the penalty retrial had the instructions regarding section 71 and title 18 United States Code section 876 not been given.

### 2. *Words to Donna Hatch*

Donna Hatch testified that on June 8, 1979, defendant called her house in Terrell, Texas. Her grandmother initially answered the telephone and when Hatch took the line, defendant "was still babbling on. I guess he thought she was still on the phone. When he found out it was me he said, 'I'll kill you, too.' "

Defendant asserts the court erred when it instructed the jury that they could consider whether defendant's words to Donna Hatch constituted a threat to Hatch in violation of California Penal Code section 653m (making annoying phone calls), and Texas Penal Code section 42.07 (harassment by telephone). We agree, but conclude the error was harmless.

In 1979, when the telephone call was made, Texas Penal Code section 42.07 defined harassment by telephone as a communication that intentionally "threatens, by telephone or in writing, to take unlawful action against any person and by this action intentionally, knowingly, or recklessly annoys or alarms the recipient or intends to annoy or alarm the recipient." (Tex. Penal Code Ann., former § 42.07(a)(2).) In 1983 the Texas Legislature amended Texas Penal Code section 42.07 to clearly delineate what types of actions would alarm or annoy people, and to specify that such actions, to be unlawful, must be performed in a manner reasonably likely to "annoy" or "alarm" the recipient of the telephone call. In 1989, the Texas courts decided that Texas Penal Code former section 42.07, as it existed before the 1983 amendment, was unconstitutionally vague (*May v. State* (Tex.Crim.App. 1989) 765 S.W.2d 438, 440), and that the 1983 amendment was constitutional (*Bader v. State* (Tex.App. 1989) 773 S.W.2d 769, 770) but not retroactive (*May v. State, supra,* 765 S.W.2d at p. 440).

Therefore, in 1979, when the telephone call was made, there was no constitutionally valid statute in effect in Texas prohibiting defendant's actions, and when the court instructed the jury pursuant to the 1983 amendment of Texas Penal Code section 42.07, it erred. The 1983 amendment did not apply retroactively and the statute in effect before the amendment was unconstitutional.

In addition, because defendant called Terrell, Texas, from Greenwood, Louisiana, and not from within California, he did not violate the laws of California. (Cf. §§ 27 [persons are liable for punishment for crimes committed, in whole or in part, within the state], 653m [an offense is deemed committed either in the place where the telephone call was made or where it was received].) The court erred, therefore, in instructing the jury to consider the facts in light of section 653m.

Further, the prosecution did not argue that the telephone call was admissible as a violation of any other penal statute. Because the telephone call originated in Louisiana, it may have violated Louisiana law, but the prosecution did not so argue. The court therefore erred in admitting the evidence as a factor in aggravation.

Any error, however, in admitting the evidence of the phone call or instructing the jury as to California and Texas penal statutes was harmless in light of the great weight of evidence presented in aggravation. We see no reasonable possibility defendant would have obtained a different verdict in the penalty retrial had the evidence of the phone call not been admitted and the erroneous instructions not been given.

K. *Asserted Error in Admitting Physical Evidence*

Defendant contends the trial court erroneously admitted certain items of evidence in violation of his federal and state constitutional rights to due process, fundamental fairness, and a reliable penalty verdict.

Before trial, defendant moved to exclude the saw, butcher knife, and rope found in the van after defendant's arrest, arguing these items, which he claimed he acquired after Eleanore Buchanan's death, were not relevant to any circumstances of the crime under section 190.3, factor (a). Defendant also argued the admission of these items would be more prejudicial than probative because it would allow the jury incorrectly to conclude that defendant had planned to use them to murder Donna Hatch.

The prosecutor countered that the items were relevant and probative under section 190.3, factor (a), as circumstantial evidence of identity, in that their similarity to the sorts of items used in the murder of Eleanore Buchanan[23] had a tendency in reason to identify defendant as Buchanan's killer. The prosecutor also argued the items were relevant under factor (b) as evidence of express or implied threats to use force or violence against Hatch and her

---

[23] Eleanore Buchanan was bound hand and foot, her head and one hand were cut off with a saw and a knife, and her other hand was cut off with a saw.

family. The court agreed, ruling that in light of defendant's continued denial of any complicity in the murder of Eleanore Buchanan, these items were admissible on the issue of identity.

Defendant now argues the court erred. First, he renews his argument that the evidence bore no relationship to the murder of Eleanore Buchanan and was therefore inadmissible under section 190.3, factor (a). Second, he argues the items were purchased before, not after, he made threats to Hatch and her family, and therefore were not connected to those threats and irrelevant to factor (b). Lastly, he argues the evidence was more prejudicial than probative, in that it allowed the jury to speculate that defendant intended to repeat his crime and murder Hatch, and therefore the court should have excluded the evidence under Evidence Code section 352.

We see no abuse of discretion. " ' "Relevant evidence is defined in Evidence Code section 210 as evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' The test of relevance is whether the evidence tends ' "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive. [Citations.]' [Citation.] The trial court has broad discretion in determining the relevance of evidence [citations] but lacks discretion to admit irrelevant evidence. [Citations.]" ' " (*People v. Carter, supra*, 36 Cal.4th 1114, 1166–1167.)

In light of defendant's continual denial that he was involved in the murder, we find the court did not abuse its discretion in determining that the items of evidence were relevant and admissible on the issue of identity as a circumstance of the crime under section 190.3, factor (a). A reasonable juror could conclude that the butcher knife, saw, and shanks of rope found inside the stolen Buchanan van driven by defendant bore marked similarities to the weapons thought to have been used to murder Eleanore Buchanan and would tend logically to support the inference that defendant was the person who murdered Eleanore Buchanan.

Further, contrary to defendant's assertions, the evidence was admissible under section 190.3, factor (b). The factual record shows that defendant purchased the butcher knife, saw, and rope after, not before, as defendant asserts, he first made threats of violence in a note he wrote Hatch. Hence, a jury could logically conclude he purchased them in anticipation of carrying

out his threats.[24] It matters not that defendant never delivered the threatening note. The note reveals that defendant's anger at Hatch and her family, and his desire to harm them if he did not get what he wanted, existed before he purchased the butcher knife, saw and rope. The court, therefore, did not err in admitting those items as evidence under section 190.3, factor (b).

Finally, defendant argues the prosecutor engaged in misconduct in encouraging the jury to speculate that he was planning to repeat his crimes and kill Donna Hatch as he had killed Eleanore Buchanan. Defendant forfeited this claim by failing to timely object. (*People v. Lewis, supra,* 43 Cal.4th at p. 503.) Nevertheless, because prosecutors have wide latitude to discuss and draw inferences from the evidence at trial, we see no misconduct in the prosecutor's comment. (*People v. Dennis* (1998) 17 Cal.4th 468, 522 [71 Cal.Rptr.2d 680, 950 P.2d 1035].)

---

[24] The record reveals the following chronological series of events:

On June 5, 1979, while defendant was still in Terrell, Texas, Hatch decided she no longer wanted to have a relationship with him, and she "broke up" with him. She attempted to hide from him by going to her brother's house and having her brother tell defendant she was not there.

On June 6, 1979, defendant remembered he had left some of his things at Hatch's grandmother's house. He attempted to retrieve them, but Hatch's grandmother "started raving at [him] for owing her rent" for the storage of his things at her house. Defendant said he had no money to pay her, and when he reached for his things, she "had a coke bottle in her hand and tried to hit [him] in the head with it. She threatened [him], talking about having her grandsons . . . getting a hold of [him.]"

Later that same day, June 6, 1979, defendant wrote the following letter to Hatch, which he did not deliver but crumpled up and tossed in the back of the van where it was found by the police: "Look, Donna. I don't know what kind of trip you are on. But I'm not going to accept being fucked over by nobody. [¶] *I already told my cousins that if anything was to happen to me that they are to get you or someone who is close to you. Which means that if I don't leave safe or if I get crossed up—you will pay one way or the other.* [¶] You were an accessory to each forgery I committed and I will turn us both in. Silbpoenas [*sic*] will be made for you to come to court and if you refuse they will come get you to make you go. I don't know what it is but someone has got to either pay for this fucking or kill me because I have put too much in this and too much has been taken out. I want my registration or I will send the police. [¶] Further more—my ride is not hot because they never got the license number in San Diego." (Italics added.)

Still later that same day, June 6, 1979, after writing the letter, defendant purchased a saw, a wrench set and a screwdriver in Terrell, Texas. He then drove to Oklahoma City to visit cousins, where he switched license plates on the van.

The following day, June 7, 1979, he purchased the butcher knife and 50 feet of rope in Lewisville, Texas, then drove toward Shreveport, Louisiana. The next day, June 8, 1979, defendant called Hatch from Greenwood, Louisiana, and told her, "I'll kill you, too." Authorities arrested defendant later that day in Marietta, Oklahoma.

## L. *Restriction of Cross-examination of Robert Borg*

James Park, a retired associate warden with California's Department of Corrections and Rehabilitation, testified for defendant. He reviewed defendant's prison records and gave his opinion that nothing in the records suggested defendant was an escape risk or prone to violence towards guards or other inmates. In his opinion, if defendant were given a sentence of life without the possibility of parole he could be reclassified and placed in a facility where he would have the opportunity to continue producing works of art and could lead a useful, productive life.

To rebut Park's testimony, the prosecution presented the testimony of Robert Borg, warden of Folsom State Prison from 1985 to 1992. He refuted some of Park's testimony regarding inmate classification. Borg disclaimed any ability to foretell whether defendant would engage in violence in prison, but testified to his opinion, based on his review of defendant's prison records, that defendant remained a threat to other inmates and guards. Borg acknowledged that he relied in great part on reports of defendant's violent encounters with other inmates during his early years in prison starting at age 16, on the violence involved in the capital offense, on the fact that many of defendant's assaults involved vulnerable victims, and on the fact that defendant committed crimes in which he snuck up on his victims. Borg stated he did not take into consideration the years defendant had spent on death row during which there were no recorded incidents of violence; he explained that in his opinion, the paucity of violence was because on death row defendant had limited opportunities to interact with other prisoners or guards while not in shackles or "under the gun."

On cross-examination, Borg acknowledged he had not reviewed defendant's entire record, and stated it might have made a difference in his assessment if he were to learn that defendant had gone into "the yard" with other death row inmates every day for a year with no incidents of violence. Defendant then sought to ask if Borg had reviewed the record of defendant's federal habeas corpus petition and hearing transcript which, he argued, indicated that for a year while on death row, defendant did have opportunities daily to engage in recreation with other inmates with no reported incidents of violence. Borg indicated he had not reviewed the habeas corpus records, and the court would not allow defense counsel to ask any other questions regarding the habeas corpus record.

Defendant now argues the restriction on his cross-examination of Borg violated his right under the confrontation clause of the Sixth Amendment.

The contention lacks merit.

" ' "[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby, 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.' " (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 680 [89 L.Ed.2d 674, 106 S.Ct. 1431] . . . , quoting *Davis v. Alaska* (1974) 415 U.S. 308, 318 [39 L.Ed.2d 347, 94 S.Ct. 1105].) However, not every restriction on a defendant's desired method of cross-examination is a constitutional violation. Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance. [Citation.] California law is in accord. (See *People v. Belmontes* (1988) 45 Cal.3d 744, 780 [248 Cal.Rptr. 126, 755 P.2d 310].) Thus, unless the defendant can show that the prohibited cross-examination would have produced "a significantly different impression of [the witnesses'] credibility" (*Van Arsdall, supra,* 475 U.S. at p. 680), the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment.' " (*People v. Chatman* (2006) 38 Cal.4th 344, 372 [42 Cal.Rptr.3d 621, 133 P.3d 534].)

The court appropriately restricted defendant from asking Borg to form an opinion about information contained in records he did not review and about which he had no knowledge. (Evid. Code, § 803.) In doing so, the court did not preclude the jury from accurately assessing Borg's credibility; defense counsel established that Borg based his opinion on a less than complete review of defendant's records, and Borg acknowledged that if he had had more information about defendant's opportunity to interact with other inmates, he might have formed a different opinion about defendant's propensity for violence. Defendant fails to show that the prohibited cross-examination, which sought only to ask specific questions about the habeas corpus record, would have significantly altered the jurors' impression of Borg's credibility.

## M. *Exclusion of Evidence Regarding Defendant's Teaching Art to Other Inmates*

Defendant testified that at certain times while on death row in San Quentin State Prison, he had "time out on the tier" during which he and "a few other inmates would sometimes bring out our [art] materials and we would give each other pointers" or he "would just sit down with them and start giving them some of the techniques . . . [he] had learned [him]self." "Other times, used to be where we could take our materials up to the yard and work in the daylight." He testified that teaching art to other death row inmates came

easily to him, and painting "makes him feel better about himself." He told the jurors that if he were to be sentenced to life without the possibility of parole and be housed with other inmates who would someday get out of prison, he "could help them by teaching them how to paint."

Defendant sought to introduce the testimony of Aida De Arteaga, an art facilitator at San Quentin State Prison, who would have testified to defendant's capacity to teach art to other inmates. Defendant argued this evidence would corroborate his own testimony about teaching other inmates to paint, and rebut Robert Borg's opinion testimony that defendant would be a threat to other prisoners if allowed to be near them without physical restraints or the presence of armed guards. The court excluded the proffered evidence as cumulative and repetitive under Evidence Code section 352.

Defendant now argues the court deprived him of a witness important to his efforts to convince the jurors to give him a sentence less than death, and thereby violated his federal and state constitutional rights to present a defense, to present evidence in mitigation, and to a reliable penalty verdict.

We review for abuse of discretion a trial court's rulings on relevance and the exclusion of evidence under Evidence Code section 352 (*People v. Avila, supra,* 38 Cal.4th at p. 578), and conclude the court did not abuse its discretion. Numerous witnesses testified to the intrinsic value of defendant's artwork, and defendant fails to show that the excluded testimony would have offered anything the jury had not already heard. In addition, the excluded testimony merely addressed defendant's willingness to teach art; it did not address whether or not defendant was under physical restraints or under the watch of armed guards while he interacted with other inmates and taught art "on the tier" or "on the yard." Defendant fails to show, therefore, that the excluded evidence would have rebutted Borg's opinion testimony.

### N. *Exclusion of Impeachment Evidence Against Jerre Brown*

Jerre Brown testified for the prosecution on October 11, 1995. He told the jury that in the fall of 1976, when he was 16 years old, he, his cousin Beverly Manning, and defendant committed a burglary at Kelly's Truck Stop in Shreveport, Louisiana, during which they stole a television set and later sold it to Brown's mother for $90. Thereafter, defendant and Manning drove to California. Defendant and Manning returned to Shreveport, Louisiana, one month later, and defendant admitted to Brown that while in California, he and Manning had beaten and robbed Ruth Story.

In December 1976, Brown, defendant, and Manning were in jail in Shreveport, Louisiana, under arrest for the burglary. Defendant asked Brown

and Manning, who were both juveniles at the time of the burglary, to take full responsibility for the burglary in order to exonerate him. Brown instead testified to the truth about the burglary and gave testimony unfavorable to defendant. While in a holding cell with 40 other inmates awaiting transportation to the courthouse from the jail, defendant attempted to stab Brown in the head with a pen, requiring the guards to spray Mace on both of them. Later, at the courthouse, defendant hit Brown in the face with his fist, knocking him against the wall.

Brown told the jurors in the penalty retrial that he had been convicted of felony theft and two "crimes against nature" in Louisiana in 1977 when he was 17, but had not been convicted of any other felonies since then. The "crimes against nature" of which he had been convicted were, in fact, "*aggravated* crimes against nature."[25] Defendant then asked Brown if he had ever been convicted of "aggravated rape," a much more serious crime,[26] to which Brown truthfully answered he had not. Out of the presence of the jury, defendant argued that a "crime against nature" by definition was "aggravated rape" and he should have been allowed to so argue to the jury. The court refused to allow defendant to ask Brown any details about the crimes against nature for which he was convicted or to introduce documents regarding

[25] Defense exhibit A, which was marked as an exhibit but never received into evidence, contained records from the Fourth Judicial District Court, Parish of Ouachita, Louisiana, that revealed that on two occasions in 1977, at the Ouachita Parish Jail, Brown was reported to have committed the aggravated rape of fellow inmates, but on both occasions he was charged with and pled guilty to the lesser offense of "aggravated crime against nature."

[26] Under Louisiana law at the time of Brown's conviction, a "crime against nature" was the "unnatural carnal copulation by a human being with another of the same sex or opposite sex or with an animal." It was punishable by a fine not to exceed $2,000, or imprisonment with or without hard labor, for not more than five years, or both. (La.Rev.Stat.Ann. former § 14:89.) An "aggravated crime against nature," as applicable herein, was a crime against nature committed (1) when the victim resists the act to the utmost, but such resistance is overcome by force, (2) when the victim is prevented from resisting the act by threats of great and immediate bodily harm accompanied by apparent power of execution, or (3) the victim is prevented from resisting the act because the offender is armed with a dangerous weapon. An aggravated crime against nature was punishable by imprisonment at hard labor for not less than three or more than 15 years without the benefit of suspension of sentence, probation or parole. (*Id.*, former § 14:89.)

Under Louisiana law at the time of Brown's conviction, "aggravated rape," as applicable herein, was a rape committed upon a person 65 years of age or older or where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances: (1) When the victim resists the act to the utmost, but whose resistance is overcome by force, (2) when the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution, or (3) when the victim is prevented from resisting the act because the offender is armed with a dangerous weapon. It was punishable by life in prison at hard labor without the benefit of parole, probation or suspension of sentence. (La.Rev.Stat.Ann. § 14:42.)

Brown's convictions, ruling that such evidence was not relevant to impeachment. Thus, the jury was not informed of the exact definition of a "crime against nature," or of the fact that Brown was convicted of "aggravated crimes against nature."

Defendant filed a motion on October 18, 1995, a week after Brown testified, to introduce the documents pertaining to Brown's convictions, arguing that the record was unclear and therefore misleading, thereby allowing the prosecution to present a "sanitized" picture of Brown that did not reveal he had committed acts involving force and violence inherent in an aggravated crime. Nearly two months later, on December 6, 1995, the court held a hearing on the motion and acknowledged that the record did not satisfactorily establish that Brown had suffered a conviction for an "aggravated" crime and that the crimes for which he was convicted were referred to in "rather antiquated language" that might not be commonly understood by a California jury. The court denied the motion, however, under Evidence Code section 352, ruling that because of the lapse of time since Brown's testimony, defendant could not raise the issue again without confusing the jury and prejudicing the prosecution. The court also concluded that defendant erred in the first instance in not asking Brown questions that would have established that his convictions were for aggravated crimes, and that Brown's credibility nevertheless had been impeached with evidence showing that he "was no angel," but a man who assisted defendant in a burglary and thereafter suffered convictions for three other serious felonies.

 Defendant now argues the court erred in denying the motion. We disagree. The trial court has broad discretion to exclude impeachment evidence under Evidence Code section 352. (*People v. Wheeler* (1992) 4 Cal.4th 284, 296 [14 Cal.Rptr.2d 418, 841 P.2d 938].) Although wide latitude should be given to cross-examination designed to test the credibility of a prosecution witness, "[t]he statute empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues." (*Ibid.*) The record reveals that during the course of Brown's testimony, both court and counsel were less than clear in their understanding of the details of Louisiana's laws regarding "crimes against nature." In light of other evidence admitted to challenge Brown's credibility, we see no abuse of discretion in the trial court's determination that any further attempts to clarify Louisiana's laws regarding the "crimes against nature" would have been confusing.

O. *Instructions Regarding Prior Unadjudicated Criminal Activity*

The trial court instructed the jurors they could consider in aggravation the following allegations of incidents of unadjudicated criminal activity under

section 190.3, factor (b): the assault and battery of Ruth Story; the assault and battery of Beverly Manning; the assault and battery of Frank Auer; the assault and battery of Kenneth Dotson; the two assaults and batteries of Jerre Brown; the assault and battery of Rosie Blackmon; the threat to Donna Hatch; the threats to Frank Sexton, Thomas McArdle, Patrick O'Connor and Brandon Armstrong; the assault, battery and attempted rape of Patricia Robinson; the assault and battery of Thomas Ryan; the assault and battery of William Hanson; and the assault of Johnnie Christiansen. The court further instructed the jurors that before they could consider these allegations as factors in aggravation, they must first be satisfied beyond a reasonable doubt that defendant in fact committed those acts. The court also instructed that they need not unanimously agree regarding each circumstance in aggravation.

Defendant argues the failure to require unanimity as to factors in aggravation allowed the jurors to impose a penalty of death based on unreliable factual findings that were not subjected to the test of a unanimous jury verdict. We have rejected this argument, and concluded that the United States Supreme Court decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] and *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428] have not altered these conclusions. (*People v. Harris, supra*, 37 Cal.4th 310, 365–366.) Defendant fails to persuade us to revisit this issue.

Defendant further argues the court's instructions failed to limit the criminal acts the jurors could consider as factors in aggravation to those specifically alleged by the prosecution. He argues the jurors might have concluded that the list of assaults set forth in the instruction was a list of examples of the types of criminal activities they could consider, rather than a list of the specific criminal actions they could consider.

We disagree. The court instructed as follows: "The mitigating circumstances I've just read for your consideration are given as examples of some of the factors that you may take into account and as reasons for deciding not to impose a death sentence in this case. You should not limit your consideration of mitigating circumstances to these specific factors." "*So, the factors in mitigation really are cited by way of example and not by way of limitation. On the other hand, the factors in aggravation*—and those essentially are the first three matters I mentioned, the facts and circumstances of the crime itself, any prior felony convictions, and any other criminal activity by Mr. Hamilton which involves the use or attempted use of force or violence or express or . . . implied threat to use force or violence. *Those are the only circumstances in aggravation which the law permits you to consider. You're not allowed to consider any other facts or circumstances as circumstances in aggravation as*

*a basis for determining that the death penalty is the appropriate penalty in this case.*" (Italics added.)

Contrary to defendant's argument, these instructions clearly informed the jurors they were specifically limited to the listed criminal acts they could consider in aggravation.

### P. Lingering Doubt Instructions

Defendant requested the court instruct the jury they could consider lingering doubt as a factor in mitigation. The court modified defendant's proposed instruction and gave the following instructions regarding lingering doubt: "Any lingering doubt you may entertain on the question of guilt may be considered by you in determining the appropriate penalty, which, of course, is the sole issue before you, choice of penalty. A lingering doubt is defined as any doubt, however slight, which is not sufficient to create in the minds of a juror reasonable doubt. . . . [¶] [A] lingering doubt is some doubt, however slight, not sufficient to create in your mind a reasonable doubt, but yet leaving a lingering doubt about his—the question of his guilt. If there is such a lingering doubt, of course, you may consider that in determining the appropriate penalty and helping you make your choice of penalty."

Defendant argues the trial court erred in failing to instruct the jurors, as he had requested, that lingering doubt may be considered a factor in mitigation. The error, he argues, violated his federal and state rights to due process.

We independently review the legal correctness of an instruction. (*People v. Berryman* (1993) 6 Cal.4th 1048, 1089 [25 Cal.Rptr.2d 867, 864 P.2d 40].) Applying that standard, we find no error.

We have previously held that " '[t]here is no constitutional entitlement to instructions on lingering doubt.' (*People v. Earp* (1999) 20 Cal.4th 826, 903 [85 Cal.Rptr.2d 857, 978 P.2d 15].) Instructions to consider the circumstances of the crime (§ 190.3, factor (a)) and any other circumstance extenuating the gravity of the crime (*id.*, factor (k)), together with defense argument highlighting the question of lingering or residual doubt, suffice to properly put the question before the penalty jury." (*People v. Demetrulias* (2006) 39 Cal.4th 1, 42 [45 Cal.Rptr.3d 407, 137 P.3d 229].) The court here instructed the jury to consider the circumstances of the crime and any other circumstances extenuating the gravity of the crime.[27] Defense counsel gave a lengthy argument about lingering doubt, in which he directly stated "lingering doubt [is] . . . an

---

[27] The court instructed the jurors, inter alia, they were to consider "the circumstances of the murder" and "any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime."

aspect of mitigation."[28] Defendant fails to convince us that the jury was not adequately informed that they could consider lingering doubt as a factor in mitigation.

The jury, however, did ask the court for clarification of the use of lingering doubt. On the second of their three days of deliberations, the jurors sent a note to the court that said, "In regards to 'lingering doubt' if we have questions, however slight, 'lingering doubt,' about the conviction for murder (in the 1st trial) is that appropriate? In other words is that to be considered as mitigating or at all." (Original underscoring.) The court sent the note back to the jurors with the following typed on the bottom of the page, above its signature: "Please see the page immediately following CALJIC 8.84 with the number 8 on the bottom." The page in the jury instruction binder given to the jurors for use during deliberations to which the court referred, which was nearly identical to that read by the court as instructions, read as follows: "For the purposes of this penalty trial, you must accept the verdicts and findings rendered by the jury in the guilt trial. That is, you must accept that the defendant has been proved guilty beyond a reasonable doubt of the charges of murder in the first degree, burglary, robbery, and kidnapping, as set forth in the information. You must accept that the special circumstance allegations have been proved to be true beyond a reasonable doubt; namely that the murder was committed by defendant and that the murder was committed while the defendant was engaged in the commission of burglary, robbery and kidnapping. [¶] *Any lingering doubts you may entertain on the question of guilt may be considered by you in determining the appropriate penalty.* [¶] *A lingering doubt is defined as any doubt, however slight, which is not sufficient to create in the minds of the jurors a reasonable doubt.*" (Italics added.)

Defendant now argues the court failed to adequately answer the jury's question and merely added to their confusion when it directed them back to the previously given instruction. He argues the jurors did not understand that they could consider lingering doubt as a factor in mitigation.

The record reveals the court notified defense counsel and defendant of the jury's question and that they agreed to the court's response. Hence, defendant

---

[28] Defense counsel spent approximately one-fourth of his closing argument discussing the facts and his theories of lingering doubt. He told the jury, "If you have any lingering doubt as to whether the defendant committed the crime you can rely upon that factor, and that factor alone all by itself to refuse to impose the ultimate penalty. If you have any lingering doubt at all"; "[i]f you find there are problems with this case that rise to the level of lingering doubt, you can rely upon that to not impose the death penalty"; and "[t]he first thing we've talked about in terms of mitigation is lingering doubt. . . . Lingering doubt, that's what we've been talking about, that aspect of mitigation."

failed to preserve this claim for appeal. In any event, the court did not err. The question did not, as defendant asserts, show confusion as to whether the jurors could consider lingering doubt as a factor in mitigation. Rather, a reasonable interpretation of the jury's question is that the jury was confused as to whether *a slight doubt* they may have had about defendant's guilt was enough to constitute a factor in mitigation, or if a slight doubt was not enough to be used *at all* in their consideration of penalty. The court correctly reinstructed the jury that doubt, however slight, may be considered.

### Q. *Prosecutorial Misconduct*

Defendant contends the prosecution engaged in numerous acts of prejudicial misconduct requiring reversal of the death judgment.

"A prosecutor's conduct violates a defendant's constitutional rights when the behavior comprises a pattern of conduct so egregious that it infects ' "the trial with unfairness as to make the resulting conviction a denial of due process." [Citation.]' (*Darden v. Wainwright*[, *supra*,] 477 U.S. 168, 181 . . . .) The focus of the inquiry is on the effect of the prosecutor's action on the defendant, not on the intent or bad faith of the prosecutor. (*People v. Crew*[, *supra*,] 31 Cal.4th 822, 839 . . . .) Conduct that does not render a trial fundamentally unfair is error under state law only when it involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " [Citation.]' " (*People v. Mendoza, supra,* 42 Cal.4th at p. 700.)

#### 1. *Statements by Prosecutor During Cross-examination of Defendant*

##### a. *Defendant as poster boy for the death penalty*

During jury selection, an editorial in the local newspaper referred to defendant as "the poster boy for the death penalty." Defendant expressed concern that the inflammatory nature of this editorial comment would bias prospective jurors against him and moved for a change of venue. The court agreed the comment was inflammatory, but denied the motion.

During cross-examination of defendant at retrial, the prosecutor asked, "You think it's hurt your kids that some people call you the poster boy for the death penalty?" Defendant did not object to the comment until the following day, when he moved for a mistrial, arguing it amounted to prejudicially inflammatory testimony by the prosecutor in the form of a question. The

court denied the motion and agreed to give a curative instruction that statements of counsel are not evidence.

Defendant renews his argument that the prosecutor committed misconduct in asking the question. Defendant forfeited this claim, however, by his failure to timely object. (See *People v. Lewis, supra,* 43 Cal.4th at p. 503.)

In any event, we see no error. When a misconduct claim focuses on comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood the jury construed or applied any of the complained-of remarks in an objectionable fashion. (See *People v. Ayala* (2000) 23 Cal.4th 225, 284 [96 Cal.Rptr.2d 682, 1 P.3d 3].) The jury here would not construe the question, reviewed in context, as particularly inflammatory. It came in the midst of a series of questions about defendant's relationship, or lack thereof, with his first wife and two children. The prosecutor asked defendant whether he valued and respected his family and established that, for the most part, defendant failed to provide them financial support and failed to hold a steady job. Defendant convinced his then pregnant wife to take part in his check-forgery schemes, and they both suffered felony convictions in 1972. He disgraced and embarrassed his parents, and had "hardly seen" his children in the past 20 years. The prosecutor then asked, "You call yourself a parent, right?" Defendant replied, "I am a parent," in a tone the court later described as a bristling, "sharply emphasized response, with at least a verbal exclamation point," indicating to the court that defendant "obviously took some umbrage to the tone of the question." The prosecutor then asked the single question, "You think it's hurt your kids that some people call you the poster boy for the death penalty?" Defendant did not object, but answered, "I've never heard anybody call me that to my face."

The prosecutor acknowledged that he used "a poor choice of words" but was trying to establish that defendant was not a good father and had left his children with "a legacy of shame."

We agree with the trial court that the comment was not well chosen, but see no reasonable likelihood the jury would construe it in an objectionable fashion.

### b. *Comments on defendant's sketch of a headless and handless corpse*

Defendant drew a sketch of a headless and handless corpse and included it in a letter he addressed to Terry Buchanan. Jail authorities intercepted the letter and delivered it to the district attorney's office. At trial, the prosecutor

asked defendant if he recalled making the sketch. Defendant said he recalled writing the letter to Terry Buchanan in which he professed his innocence of the murder, but could not identify the sketch without seeing it in the context of the entire letter. The prosecutor did not offer the letter, but showed defendant the sketch and reminded him that the prosecution had taken great care not to expose Terry Buchanan to photographs of his wife's dismembered body. The prosecutor then asked, "After avoiding [him] all that time you sent him that sketch, didn't you?" Defendant repeated he could not identify the sketch out of the context of the letter. Before defendant could object, the prosecutor said, "Maybe we can show that to Eve de Bona, see if she . . . ." Eve de Bona was an artist who taught painting at San Quentin State Prison and who had testified that defendant produced many studies of faces and portraits of women and had a particular and recognizable artistic style.

Because defendant refused to identify the sketch, the prosecution did not offer it into evidence. Defendant now argues the prosecutor nonetheless showed the sketch to the jurors by holding it up in their line of sight while questioning defendant. He argues this constituted prejudicial misconduct.

The record does not support the claim. The record indicates only that during discussion out of the presence of the jury, defense counsel said, "Then he lifted up the sketch. Did you draw that sketch? Look where he's sitting. Look where the jury is." In spite of defendant's inferences to the contrary, this record does not establish that the jurors actually ever saw the sketch.

Defendant also challenges the prosecutor's sarcastic remark about Eve de Bona, arguing that it allowed the prosecutor to change evidence defendant offered in mitigation about his prison artwork into evidence in aggravation. Even if arguably inappropriate, the prosecutor's comment was not evidence, and did not constitute misconduct.

c. *Comments on other sketches by defendant*

Defendant also claims the prosecutor engaged in misconduct when, during defendant's cross-examination, he handed defendant more of his sketches, offered into evidence by defendant, and asked him if the sketches were "basically sketches of heads of women? . . . Portraits?"

Defendant argues the prosecutor's questions improperly suggested to the jury that evidence of defendant's artistic talents he had offered in mitigation actually revealed an underlying morbid fascination with women's heads. He argues the prosecutor thereby improperly turned evidence in mitigation into evidence in aggravation.

Defendant forfeited this claim on appeal when he failed to object at the time the prosecutor asked the complained-of questions. (*People v. Lewis, supra*, 43 Cal.4th at p. 503.) In any event, the claim lacks merit. Prosecutors "have wide latitude to discuss and draw inferences from the evidence at trial," and whether "the inferences the prosecutor draws are reasonable is for the jury to decide." (*People v. Dennis, supra*, 17 Cal.4th at p. 522.) The prosecutor here merely pointed to defendant's sketches and allowed the jury to draw their own inferences as to what, if anything, they revealed about defendant.

### 2. Questions of Witness Park

#### a. Prison violence

Defendant next argues the prosecutor erred when he asked a series of questions of defense witness James Park about specific incidents of violence in California prisons.

During cross-examination of Park, a former associate warden at San Quentin State Prison, the prosecutor asked, "You know who George Jackson was, don't you? . . . [¶] . . . He was a killer, wasn't he?" When the prosecutor asked, "Let's go back to George Jackson's days at Soledad," defendant objected on grounds of relevance. Out of the presence of the jury the prosecutor explained that at San Quentin State Prison in 1971, when Park was responsible for the security of visitors coming into the prison, an attorney allegedly smuggled a gun to inmate Jackson, who used it later that day to murder three guards and two fellow inmates before being shot to death in the prison yard. The court excluded the proffered evidence under Evidence Code section 352.

Shortly thereafter, the prosecutor asked Park, "[Did you] have a stress problem in . . . late 1971?" Park replied, "Well, I think the incident you referred to was stressful. I was not incapacitated, I was stressed out, as they say." The prosecutor asked, "As a result of that incident in 1971 there was a lot of disruption in the prison system, wasn't there?" The court sustained defendant's relevance objection.

The prosecutor returned to the area of inquiry several minutes later, asking, without further objection by the defense, "August 21, 1971, three guards were killed at San Quentin Prison, right? . . . And two white prisoners were killed the same day, right? . . . That last one was San Quentin while you were there?" The prosecutor then asked Park if he knew that "a civilian laundry

worker was killed at Folsom [State Prison] [in September, 1971]," "that same month, September, 1971, two guards were attacked at [Deuel] Vocational Institute, right, one of them stabbed almost fatally," and at Soledad State Prison in "1969 . . . a prison guard was thrown off the cell block to his death below by some members of the Black Guerrilla Family?" Park acknowledged he was aware of these incidents but, to his knowledge, members of the Black Guerrilla Family were not involved or charged with the killing of the guard at Soledad State Prison. Defendant then objected to the area of questioning on grounds of relevance. The court sustained the objection.

Defendant now argues the prosecutor engaged in misconduct in raising the issues surrounding the 1971 murders at San Quentin State Prison in spite of the court's initial ruling, thereby inflaming the jury against him and Park. Defendant also argues the prosecutor introduced impermissible racial factors into the jury's consideration and diverted the jury's attention from its proper function.

We disagree. The court's initial ruling prohibited the prosecutor from asking specific questions about the details surrounding the 1971 San Quentin State Prison murders, not general questions about incidents of prison violence.

Further, the record does not support defendant's argument that the prosecutor's questions introduced racial factors into the jury's consideration. With the exception of the description of the two prisoners killed at San Quentin State Prison as "two white prisoners," and the killers at Soledad State Prison as "members of the Black Guerrilla Family," which Park directly refuted, the prosecutor did not identify the race of any of the killers or victims in his list of other violent prison incidents, did not improperly suggest to the jurors that "black prisoners were particularly dangerous," as defendant suggests, and did not argue or infer that defendant was in any manner associated with these incidents of prison violence or with the Black Guerrilla Family.

### b. *Inmate lawsuits*

Defendant next argues the prosecutor engaged in misconduct when, after establishing that prisoners in maximum security prisons sentenced to life without the possibility of parole are given the opportunity to play basketball and handball, lift weights, play chess and other board games, watch television, listen to the radio, and read books and magazines, he asked Park if prisoners file lawsuits "just for fun." The prosecutor attempted to ask the question in three different ways; the court sustained defendant's objections that the questions were argumentative, irrelevant, and speculative.

Defendant now argues that in asking and re-asking the objectionable questions, the prosecutor exploited recent public concerns about an increase in frivolous lawsuits filed by prisoners and suggested to the jury that if defendant received a sentence of life without the possibility of parole, he, too, would entertain himself by filing frivolous lawsuits.

We disagree. This exchange of three general questions regarding Park's knowledge of frivolous lawsuits was not egregious, deceptive, or reprehensible.

### 3. Eliciting Sympathy and Bolstering Credibility of Two Prosecution Witnesses

Defendant next argues the prosecution committed misconduct when it elicited the following testimony from Ruth Story, the victim of defendant's 1977 assault and robbery: "I was in a major automobile accident in 1958 and I was—I was almost killed. I was severely injured on the whole right side, and I've used a cane ever since then. . . . We were going to Camp Pendleton to take my son back to the base after he had been home on leave."

Defendant argues that none of this testimony was relevant to the issue of defendant's penalty, and the prosecution elicited it in order to appeal to the sympathy of the jurors.

We disagree. The fact that Ruth Story had walked with a cane for years before the time defendant assaulted and robbed her was relevant to paint the picture of defendant using force and violence against a frail and vulnerable victim, a fact in aggravation admissible under section 190.3, factor (b). Her testimony as to how she came to need the cane was merely foundational. It was not extensive or melodramatic, and did not inappropriately bolster her credibility or increase the sympathy of the jurors.

Defendant further argues the prosecution engaged in misconduct when it elicited from witness Frank Sexton, the deputy district attorney formerly assigned to the case, the fact that his hearing was impaired as a result of his having had to jump out of an airplane during World War II. We disagree with defendant's characterization of this testimony as an attempt to enhance Sexton's credibility. These few background facts served only to introduce the witness to the jurors and, arguably, to explain any difficulties Sexton might have in hearing the proceedings during the course of his testimony.

### 4. Closing Argument

Defendant next argues the prosecutor engaged in misconduct during his closing argument when he made statements that injected irrelevant and inflammatory factors into the jury's consideration.

### a. *Defendant as "monster"*

The prosecutor described defendant as "a monster below the surface" who "pretends to be something he is not," and compared him to Dr. Jekyll and Mr. Hyde. The court overruled defendant's objection to this comment, stating the argument was not improper because defendant's prior convictions involved acts of theft, dishonesty or deception, and the prosecution was entitled to speak to the egregious aspects of the capital crime. Defendant now argues that by making the comment, the prosecutor engaged in misconduct by suggesting, without psychological evidence in support, that defendant harbored an inner compulsion to kill.

Defendant did not object on these grounds at trial, and, therefore, has forfeited the claim on appeal. (*People v. Lewis, supra,* 43 Cal.4th at p. 503.) In any event, we see no misconduct. In light of the numerous incidents in which defendant admitted he lied and gave conflicting stories to the police, a comment that defendant might have harbored two sides to his personality, akin to Dr. Jekyll and Mr. Hyde, was neither objectionable nor inflammatory. Nor was there a reasonable likelihood that the jury would infer from the prosecutor's suggestions that the prosecution was actually offering a scientific analysis of defendant's psyche.

### b. *Characterization of life without possibility of parole (LWOP)*

The prosecutor reminded the jury of defendant's numerous acts of violence: "Pat Robinson at the jail . . . he didn't want her to leave." "Rosie Blackmon. She wanted to leave the hotel room and he didn't want her to leave." "Kenneth Dotson [who] crossed him by testifying against him." "Jerre Brown testified against him, crossed him. That resulted in a battery." "Tom Ryan crossed him, I suppose, . . . and Hamilton asked him to come down to the jail for an interview and that's when he socked Ryan." "Donna Hatch crossed him . . . and he threatened to kill her." "Ruth Story . . . [who was] walking down the street with the aid of a cane, holding on to her purse. She was no threat to Bernard Hamilton at all . . . [and he] punched her in the face." "Frank Auer, jail visitor, attacked." "Deputy sheriff officers Christensen and Hanson, jail guards, [assaulted.]"

The prosecutor then stated, "Bernard Hamilton always was and always will be a vicious, self-centered individual. The defense is going to ask you to give him a penalty of life without the possibility of parole, and I think that we call that LWOP. There's another meaning you can give LWOP. You can call it a license without penalty to commit acts of violence on people in prison.

Anybody that comes into that prison that's around Bernard Hamilton is going to be at risk."

Defendant argues the prosecutor engaged in misconduct when he characterized a sentence of life without the possibility of parole as a license to commit acts of violence. Defendant failed to object to the statement when made and thus failed to preserve this contention for appeal. (*People v. Lewis, supra,* 43 Cal.4th at p. 503.) In any event, there was no misconduct. The prosecutor made this single attempt at wordplay in the course of a larger argument regarding defendant's numerous acts of violence. It was a proper comment on defendant's assertions that if given a sentence of less than death he would not be a threat to others in prison. We see no reasonable probability the jury would construe the comment in an objectionable fashion.

### c. *Misstatement of evidence*

Defendant claims the prosecutor misstated evidence. Donna Hatch testified on direct examination that defendant told her "he thought he had *killed somebody*." (Italics added.) On cross-examination, defendant asked her to correct herself, suggesting that the exact words he had said were, "they think I killed a man." Hatch answered, "It was '*a man*.' You did say '*man*.' " (Italics added.) In closing argument the prosecutor stated, "Donna said he was very upset, very nervous. . . . He said, 'The police are looking for me, I think I may have *killed somebody*.' " (Italics added.)

Defendant argues the prosecutor prejudicially misstated the evidence to conform to his version of the facts. He did not object at trial and therefore failed to preserve this claim for appeal, but, in any event, the claim has no merit. The court instructed the jury that argument by counsel was not evidence, and we presume it followed the court's instructions. (See *People v. Dunkle, supra,* 36 Cal.4th at p. 920.)

### d. *Characterization of defendant's defense*

Several sets of tire tracks were found at the site in Pine Valley where Harry Piper, the target shooter, discovered Eleanore Buchanan's body. The prosecution established that some of the tire marks might have been made by Piper's small sports car but none matched the tires on the Buchanans' van or were definitively connected to the Buchanan murder. A large portion of defendant's case included challenges to the forensic evidence regarding the tire marks.

In the course of his closing argument, the prosecutor reviewed defendant's testimony regarding the events of the night of May 30, 1979, and defendant's consistent denial of complicity in the murder, and commented, "There's

another one of Hamilton's favorite suspects, Harry Piper." Contrary to defendant's assertions, this offhand comment on defendant's continuing efforts to suggest that someone other than he was responsible for the murder was not misleading or improper, and did not constitute misconduct.

### e. *Mischaracterization of defense witness*

Gary McIntyre testified for defendant that he met with defendant on the night and at the time of the murder. On cross-examination, McIntyre acknowledged the prosecution had served him with two subpoenas requiring him to appear and testify for the prosecution. He told the jury he lost the subpoenas that informed him of the correct trial date after being evicted from his home, and therefore failed to show up. The prosecutor then asked McIntyre, "[B]ecause you didn't show up, you were arrested and brought in?" McIntyre denied the truth of this assertion, and the prosecution presented no evidence that McIntyre had been arrested.

In his closing argument, the prosecutor urged the jury to dismiss McIntyre's testimony that gave defendant an alibi for the time of the murder and argued, "he was in the wind. We gave him two subpoenas and he didn't show up. . . . Of course later, as revealed in the testimony, he was arrested and brought in here. The defense put him on as a witness."

Defendant argues the prosecutor engaged in misconduct by arguing, in the absence of any evidence in support, that McIntyre had been arrested. Defendant did not object at the time the comment was made and therefore failed to preserve the issue for appeal. In any event, we find no prejudice. The court instructed the jury that questions and argument by counsel were not evidence, and we presume it followed the court's instructions. (See *People v. Dunkle, supra*, 36 Cal.4th at p. 920.)

### f. *Injection of personal beliefs*

Defense witness Thomas Baier, past president of the Louisiana Coalition to Abolish the Death Penalty, testified he bought one of defendant's paintings at a conference for the National Coalition to Abolish the Death Penalty. In closing argument, the prosecutor commented, "And I want to tell Mr. Baier that the death penalty is not the problem. The problem is murder, murder of people like Fran Buchanan. So, Mr. Baier, if you want to do the community some good, why don't you form the Louisiana Coalition to Abolish Murder."

Defendant argues the prosecutor improperly injected his personal beliefs about the death penalty into his argument, using the "weight of his office" to inflame the jury against death penalty opponents. Defendant did not object to

the comment at trial and thus failed to preserve the claim for appeal. In any event, the claim is without merit. Even if this comment could be interpreted as a statement of the prosecutor's personal beliefs, it was limited, isolated, and neither inflammatory nor so egregious as to infect the trial with unfairness, nor was it a deceptive or reprehensible method used to persuade the jury. (*People v. Mendoza, supra*, 42 Cal.4th at p. 700.)

### g. *Rejection of defendant's evidence in mitigation*

Defendant next argues the prosecutor engaged in misconduct when he urged the jury to reject defendant's evidence in mitigation with his comments on the testimony of San Quentin State Prison art facilitator Eve de Bona. The prosecutor stated, "My question to Miss de Bona is: Do you think any painting he's ever done or ever will do can possibly excuse what he did to Fran Buchanan? Is that a reason to let him live? I don't think so."

Defendant argues the prosecutor again interjected his personal views on the death penalty into the jury's minds and misled the jury as to the nature of mitigating evidence. Defendant did not object to this comment at trial and therefore failed to preserve the claim for appeal. In any event, the claim has no merit. Even if the comment was an inappropriate statement of the prosecutor's personal beliefs, it was not egregious, deceptive or reprehensible.

### h. *Call for vengeance*

Finally, defendant argues the prosecutor engaged in misconduct when he inappropriately called for vengeance from the jury. Not so.

" '[I]solated, brief references to retribution or community vengeance . . . , although potentially inflammatory, do not constitute misconduct so long as such arguments do not form the principal basis for advocating imposition of the death penalty.' " (*People v. Wash* (1993) 6 Cal.4th 215, 262 [24 Cal.Rptr.2d 421, 861 P.2d 1107].) Near the end of his closing argument, the prosecutor stated, "I don't get a rebuttal argument. When I'm done, I'm done. And you'll hear from the defense. They are going to argue to you to spare this man's life. . . . Whatever they say there's always going to be a good counterargument to it. They may say putting Bernard Hamilton to death will not bring back Fran. Well, the truth is sparing his life won't bring back Fran either. . . . *They may say that the death penalty is just revenge. Well, you know, any punishment is revenge in a sense. And I say, what's wrong with revenge? There are some things that should be avenged. What's moral about letting a killer live?* . . . The defense may say that life without the possibility of parole is an adequate punishment in this case. You know, I—do you remember the Disney movie, 'Song of the South' years ago, came out in the

late 40's? . . . Brer Rabbit was a cunning fellow. . . . The briar patch was a bad place for most people but not for Brer Rabbit. Well, I look at prison as Bernard's briar patch. That's a terrible place for most people . . . but that's where he's been all these years. . . . This is just business as usual for him." (Italics added.)

The prosecutor's mention of vengeance and revenge was a brief portion of a larger argument asking the jurors to keep in mind that there were other ways to think about arguments he anticipated the defense would make. The remark was brief, not inflammatory, and could not be construed as being the principal basis of the prosecutor's argument regarding the appropriate and fair sentence. Any conceivable error, therefore, was harmless.

### R. *Constitutionality of California's Death Penalty Law*

Defendant raises a number of facial constitutional challenges to California's death penalty law, claims we have repeatedly rejected and find no persuasive reason to reexamine. Accordingly, we continue to hold as follows:

Consideration of the circumstances of the crime under section 190.3, factor (a), does not result in arbitrary or capricious imposition of the death penalty. (*People v. Watson* (2008) 43 Cal.4th 652, 703 [76 Cal.Rptr.3d 208, 182 P.3d 543].)

California death penalty law is not unconstitutional for failing to impose a burden of proof—whether beyond a reasonable doubt or by a preponderance of the evidence—as to the existence of aggravating circumstances, the greater weight of aggravating circumstances over mitigating circumstances, and the appropriateness of a death sentence. (*People v. Watson, supra,* 43 Cal.4th at p. 703; see also *People v. Morrison* (2004) 34 Cal.4th 698, 731 [21 Cal.Rptr.3d 682, 101 P.3d 568] [neither *Apprendi v. New Jersey, supra,* 530 U.S. 466, nor *Ring v. Arizona, supra,* 536 U.S. 584, warrants reconsideration of our conclusion that the death penalty statute is not unconstitutional for failing to provide the jury with instructions on the burden of proof].)

A jury in a capital case need not make written findings. (*People v. Watson, supra,* 43 Cal.4th at p. 703.)

The jury is not constitutionally required to achieve unanimity as to aggravating factors. (*People v. Watson, supra,* 43 Cal.4th at p. 703; *People v. Brown, supra,* 33 Cal.4th at p. 402.) Recent United States Supreme Court decisions in *Apprendi v. New Jersey, supra,* 530 U.S. 466, and *Ring v. Arizona, supra,* 536 U.S. 584 have not altered these conclusions. (*People v. Brown, supra,* 33 Cal.4th at p. 402.)

The failure to require intercase proportionality review does not render the law unconstitutional. (*People v. Watson, supra,* 43 Cal.4th at p. 704; *People v. Brown, supra,* 33 Cal.4th at p. 402.)

The trial court is not required to identify which factors are aggravating and which are mitigating, or to instruct the jury to restrict its consideration of evidence in this regard. (*People v. Watson, supra*, 43 Cal.4th at p. 704; *People v. Brown, supra*, 33 Cal.4th at p. 402.)

California's death penalty statute does not violate equal protection by denying capital defendants certain procedural safeguards, such as jury unanimity and written jury findings, while affording such safeguards to noncapital defendants. (*People v. Watson, supra*, 43 Cal.4th at pp. 703–704; *People v. Blair, supra*, 36 Cal.4th 686, 754.)

### S. Death Penalty Imposed in Violation of International Law

Defendant argues California is bound by international law and treaties to which the United States is a signatory, including the International Covenant on Civil and Political Rights, the Universal Declaration of Human Rights, the American Declaration of the Rights and Duties of Man, the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, the European Convention for the Protection of Human Rights and Fundamental Freedoms, and the Vienna Convention on the Law of Treaties. He argues that imposing the death penalty violates his right to life, to be tried before an impartial tribunal, to access to the courts, to protection against prosecutorial misconduct, and to a fair hearing as protected by these international laws and treaties.

We disagree. International law does not prohibit a sentence of death where, as here, it was rendered in accordance with state and federal constitutional and statutory requirements. (See *People v. Alfaro* (2007) 41 Cal.4th 1277, 1332 [63 Cal.Rptr.3d 433, 163 P.3d 118]; *People v. Cornwell* (2005) 37 Cal.4th 50, 106 [33 Cal.Rptr.3d 1, 117 P.3d 622]; *People v. Harris, supra*, 37 Cal.4th at p. 366.) To the extent defendant challenges the death penalty itself as violative of international norms, we again reject this claim as we have done repeatedly and consistently in other cases. (*People v. Panah* (2005) 35 Cal.4th 395, 500–501 [25 Cal.Rptr.3d 672, 107 P.3d 790].)

### T. Cumulative Error

Finally, defendant contends that the cumulative effect of errors in the penalty retrial requires reversal. Defendant has demonstrated few errors, and we have found each error or possible error to be harmless when considered separately. Considering them together, we likewise conclude that their cumulative effect does not warrant reversal of the judgment.

## IV. CONCLUSION

The judgment is affirmed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied April 22, 2009. Corrigan, J., did not participate therein.